**KOPPERS COMPANY, Inc., Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

Civ. A. No. 62-985.

United States District Court
W. D. Pennsylvania.
April 27, 1964.

John M. Crimmins, T. D. Taubeneck, Pittsburgh, Pa., for plaintiff.

Edward J. Snyder, Dept. of Justice, Washington, D. C., for defendant.

MARSH, District Judge.

This is an action for recovery of federal income taxes and interest in the amount of $25,089.41, paid by Koppers Company, Inc. (Koppers) as transferee of National Wood Treating Corporation (National) with respect to National's fiscal year ended April 30, 1956, together with interest according to law. (Pretrial stipulation, ¶ I.)

In our opinion, the plaintiff is entitled to a recovery.

The parties agreed upon the following factual issue to be litigated: Whether National, after the acquisition of its stock by Koppers in July, 1955, continued to carry on a trade or business substantially the same as it conducted prior to that acquisition. (Pretrial stipulation, ¶ II–1.)

If the affirmative of this issue were established, plaintiff would be entitled to carry over a claimed pre-acquisition net operating loss pursuant to § 382, 26 U.S. C.A.[1]

However, the defendant attacked the amount of National's pre-acquisition net operating loss and presented a second factual issue: Whether National incurred a deductible net operating loss of $47,371.53[2] in its fiscal year ended April 30, 1955 in accordance with § 172, 26 U.S.C.A.

At the pretrial conference, the plaintiff objected to the interposition of the second issue for the following reasons: (1) it was raised in violation of the Order of Court Fixing Pretrial Procedure;[3] (2) the defendant was barred from raising the issue by the statute of limitations, § 6501(a), 26 U.S.C.A.;[4] (3) review of National's 1955 return is prohibited by § 6406, 26 U.S.C.A.[5]

In support of its first objection, the plaintiff pointed out that such an issue theretofore had not been mentioned although eight years had elapsed since National's 1955 tax return had been filed, that over one year had elapsed since the claim for refund was made, and that over six months had elapsed since suit was filed.[6]

Notwithstanding, the court granted the defendant the right to include the second issue and allowed six more weeks for additional discovery. The court requested that the pretrial stipulation be amended by the parties after the discovery was completed.[7]

The additional discovery was completed, but the pretrial stipulation was not amended which gave rise to further

---

1. The pertinent part of § 382(a) is as follows:

    "(1) In general.—If, at the end of a taxable year of a corporation—

    "* * * *

    "(C) such corporation has not continued to carry on a trade or business substantially the same as that conducted before any change in the percentage ownership of the fair market value of such stock, the net operating loss carryovers, if any, from prior taxable years of such corporation to such taxable year and subsequent taxable years shall not be included in the net operating loss deduction for such taxable year and subsequent taxable years."

    See also, Treasury Regulations promulgated in 1962, § 1.382(a)–1(h).

2. The total deductions for the year ended April 30, 1955, amounted to $200,-216.57, while the taxable income for that year totaled $152,845.04 (Ex. C.)

3. The Order of Court Fixing Pretrial Procedure specified that "not later than May 31, 1963, * * * each attorney shall make known the details of evidence to be adduced at the trial and his contentions regarding the applicable law involved." The defendant did not comply with respect to the second issue. See: Pretrial transcript, pp. 3–14.

4. See Pretrial transcript, p. 4.

5. Plaintiff's Memorandum of Points and Authorities, received November 4, 1963, p. 3.

6. Pretrial transcript, p. 5.

7. Pretrial transcript, pp. 11–12. See Pretrial Order dated July 9, 1963.

objections to issue No. 2 by the plaintiff at the trial.[8]

The trial objections were based on the failure of the defendant to comply with the pretrial order to amend the pretrial stipulation after the additional discovery had been completed, and on the ground that the statute of limitations barred the issue.

In our opinion, the plaintiff's objections should be overruled.[9] Of course, after the additional discovery was completed, the parties jointly should have amended their pretrial stipulation to specify the amount of the net operating loss to be litigated, and, perhaps, the court was remiss in failing to insist upon such an amendment before trial in order that issue No. 2 might have been formally narrowed. However, we are satisfied that issue No. 2 was effectively narrowed not only at the conference but at the trial itself.

At the conference, defendant's counsel stated that it was contesting only a "specific portion" of the $47,371.53 net operating loss, which portion he described as "extraordinary selling expenses, some $7,300.00, more or less, of which is alleged to have been incurred in the alleged loss year" (i. e., the fiscal year ending April 30, 1955), and "some $20,700.00, more or less, which was alleged to have been incurred in prior years, that is, years ended April 30, 1954 and earlier." [10]

At trial defendant's counsel further narrowed that issue. He stated:

"The testimony to be introduced today is going to show that some $20,000 [$20,734.17] of that $28,000 [$28,089.17] was an expense which should have been accrued in prior years; that is, in 1951 through 1954.

"It is our contention that these expenses not having been accrued in those years, the deduction is lost *and only the current portion of the loss of expense can be properly claimed as a deduction.*" [11] (Emphasis ours.)

Subsequently, he stated:

"[W]e do in the first instance question so much of that net operating loss as represents a payment in the fiscal year ended April 30th, 1955 for extraordinary selling expenses which should properly have been accrued in prior years, *and I think at this time it is only fair to point out that of this amount of some $28,000 of expenses, we understand that perhaps some $7,300 represents an expense incurred and properly accrued in the fiscal year ended April 30th, 1955, and that the balance—some $20,000—which represents an alleged expense payment on behalf of earlier years is not a proper expense.* It is an expense which should have accrued in the earlier years * * *." [12] (Emphasis ours.)

Therefore, although in the unamended pretrial stipulation, the defendant broadly contended in issue No. 2 that a deductible net operating loss of $47,371.53 was not incurred by National, and put plaintiff to its proof, at trial it effectively narrowed that issue *to whether a portion of the net operating loss, comprised of certain itemized deductions totalling $20,734.17, was properly deductible.*[13]

---

8. See: Trial transcript, pp. 5–6, 96, 101–102; plaintiff's brief, pp. 3, 12–13.

9. From the content of its briefs we gather that plaintiff is no longer pressing its objections with respect to the statute of limitations and with respect to its claim that review of National's 1955 return is prohibited by § 6406, 26 U.S.C.A. See: 5 Mertens, Law of Federal Income Taxation, § 29.16.

10. Pretrial transcript, pp. 13, 14.

11. Trial transcript, pp. 13, 14.

12. Trial transcript, pp. 97, 98.

13. After the trial, the defendant submitted a proposed conclusion of law (No. 2) stating as follows: "$20,734.17 of the $28,089.17 payment from National to Monarch is not a properly accrued ex-

Although plaintiff had the burden of proving that the $20,734.17 represented a payment for ordinary and necessary business expenses so as to properly comprise a portion of the deductible net operating loss, it was the defendant who undertook to produce the testimony of William B. Land by way of deposition. His uncontradicted testimony established that the so-called "extraordinary selling expenses" were ordinary and necessary business expenses incurred for services actually rendered and beneficial to National, and that the payment for such expenses was reasonable. It is our opinion in the circumstances that these expenses were properly accrued in the year ending April 30, 1955.

From the evidence, stipulations, and exhibits, the court makes the following:

## FINDINGS OF FACT

1. The plaintiff, Koppers Company, Inc., a Delaware corporation with its principal place of business in this judicial district, is the transferee of all the stock of National Wood Treating Corporation, a Delaware corporation, which at all times pertinent to this action had its principal place of business at Oroville, California.

2. The defendant is the United States of America.

3. A deficiency of $25,089.41 with respect to the income tax liability of National for the fiscal year ending April 30, 1956, was assessed against Koppers. The assessment was paid by Koppers to the defendant on January 8, 1960. On December 28, 1961, a claim for refund was duly filed. The claim for refund has not been allowed, and six months elapsed from the date of filing the claim until commencement of this action.

4. On July 25, 1955, Koppers acquired all of the stock of National from the Georgia Pacific Corporation. On that date, Koppers by purchasing the stock of National owned a percentage of the total fair market value of the outstanding stock of National which was at least 50 percentage points more than Koppers owned on May 1, 1955, the beginning of National's taxable year. § 382(a) (1) (A) (i), Title 26 U.S.C.A.

5. Prior to July 1, 1955, the Georgia Pacific Corporation had purchased all of the stock of National.

6. Also, by July 1, 1955, the Georgia Pacific Corporation had purchased from Feather River Pine Mills, Inc. (Feather River) wood products [14] consisting of poles, posts, and lumber which had been stored by Feather River on the property of National at Oroville, California.

7. On or shortly after July 25, 1955, Koppers also purchased from Georgia Pacific "inventory", the value of which was approximately $1,000,000.00 (T., p. 28).

8. Pursuant to a plan of liquidation and dissolution, National was liquidated on December 31, 1955 (Ex. D).

9. For several years prior to the acquisition of its stock by Koppers and continuing up to the date of acquisition, National, at its plant in Oroville, was engaged in the business of treating various wood products such as telephone poles, posts, and lumber.

10. Prior to the acquisition by Georgia Pacific, 90% of the wood products stored on National's property belonged to Feather River, and National was engaged in treating these wood products and selling them for Feather River.

11. After these wood products were purchased by Georgia Pacific Corporation, National treated and sold for Georgia Pacific's account.

12. After these wood products were purchased by Koppers, National treated and sold for Koppers' account (T., p. 27).

13. After the acquisition of the stock of National by Koppers, National purchased merchandise for sale in the amount of $564,513.66, consisting pre-

pense in National's fiscal year ended April 30, 1955 in accordance with Section 461, Internal Revenue Code of 1954."

14. The wood products stored on National's property were frequently referred to as "inventory" in the testimony.

dominantly of wood products, a portion of which it treated and sold (Ex. D).

14. National's plant consisted, inter alia, of an office building and other miscellaneous buildings, two treating cylinders, pumps, motors, storage and mixing tanks, a pole peeling machine, a planer and incising machine, trucks, and other pertinent equipment and land for storage (Ex. 2 and Ex. D).

15. The wood treating industry in which National was engaged is defined in the 1958 Census of Manufacturers (Ex. E, p. 24C–2) as follows:

"*2491—Wood Preserving*

"This industry comprises establishments primarily engaged in treating wood, sawed or planed in other establishments, with creosote or other preservatives to prevent decay and to protect against fire and insects. This industry also includes the cutting, treating, and selling of poles, posts, and piling, but establishments primarily engaged in manufacturing other wood products which they may also treat with preservatives, are not included." (See also, T., p. 52.)

16. Prior to the acquisition of its stock by Koppers, National carried on the business of treating poles, posts, lumber and other wood products by the pressure treatment method. The pressure treatment method utilized by National involved the impregnation of wood with pentachlorophenol, used about 80% of the time, and chemonite, used about 20% of the time.

17. Both prior and subsequent to the acquisition of its stock by Koppers, the wood National treated was sold by it to a variety of customers at many different locations for a variety of purposes.

18. Subsequent to the acquisition of its stock by Koppers, National continued to carry on a business substantially the same as that conducted by it prior to the acquisition. Specifically, it continued to carry on the pressure treatment of wood at the same location, i. e., its plant at Oroville. It continued to employ substantially the same number of employees. Its plant, equipment, and the treating processes used at the plant remained the same. It continued to sell treated wood to many of the same customers that it dealt with prior to the acquisition.[15] Following the acquisition, it discontinued the use of chemonite because the license for its use expired in the Fall of 1955, and it substituted creosote, and perhaps other types of preservatives which it had not utilized prior to the acquisition. These substituted preservatives were used in the pressure treatment of wood and were employed in the same basic equipment it had used prior to the acquisition. Some of the treated wood it sold after the acquisition belonged to Koppers (T., pp. 27–28), and some wood products it acquired, treated, and sold for its own account. National's inventory on December 31, 1955, the date of liquidation, was $111,767.92 (Ex. D).

19. After the acquisition, National's business was directly related to the business carried on prior thereto; there was no change in its basic character; there were some changes in the ways, means, and methods of operation, but the business itself remained substantially the same.

20. During its taxable year ended April 30, 1955, National claimed a net operating loss in the amount of $47,371.53 as reflected in its federal income tax return filed for that year (Ex. C). This return was prepared by an independent Certified Public Accountant who verified that the items claimed were proper deductions.

21. The defendant has challenged only a portion of the deductions, i. e., an item in the amount of $20,734.17. The other deductions have not been challenged.

15. The 141 customers with whom National dealt in the six-month period from July 1, 1955, to the date of liquidation on December 31, 1955, were also, with few exceptions, among the 284 customers dealt with by National during the twelve-month period from July 1, 1954 through June 30, 1955.

22. The $20,734.17 item challenged by the defendant was shown by the witness William B. Land, called by the defendant, to be part of a payment in the total amount of $28,089.17 made by National to Monarch Lumber Company (Monarch), a partnership, for items of rent, office supplies, secretarial help, telephone expenses, and automobile expenses. For a period of 46 months, beginning in July, 1951, Monarch had been paying the rent for its offices shared by National at Monarch's Oakland office location, and National during that period also shared and used, without paying therefor, Monarch's office facilities and supplies, its telephone service, its secretarial and clerical employees, its fleet parking space; and Monarch paid for gasoline supplied to and repairs made upon automobiles belonging to two of National's employees.

23. On April 30, 1955, Monarch invoiced National for the amount of $28,089.17, being the negotiated total of the amounts spent by Monarch in behalf of National. These amounts were for some of the ordinary and necessary business expenses of National during the 46-month period. National had not at any time prior to April 30, 1955, been billed by Monarch for any portion of these expenses. Additionally, National had not prior to that date made any payments to Monarch or made any entry on its books for any portion of these charges. On or about April 30, 1955, National entered these expense items upon its books and by check No. 3440 paid $28,089.17 to Monarch (see answers to interrogatories and deposition of Mary E. Lanigar). Of the $28,089.17 agreed upon as National's share of the expenses, $7,355.00 was reasonably attributed to the taxable year in which the invoicing was made, and $20,734.17 was reasonably attributed to the period commencing July 1, 1951 and ending April 30, 1954.

24. Until the negotiations in 1955 between Monarch and National resulting in the invoice of April 30, 1955, for the amount of $28,089.17, there was no agreement that National would reimburse Monarch in any amount. Monarch paid the foregoing expenses without ever notifying National of the precise amounts.

25. National had no liability for these expenses until the negotiations with Monarch resulted in an agreement for such reimbursement. The agreement was reached shortly before the invoice was rendered.

26. The negotiations were conducted on behalf of National by William B. Land, managing director of and a stockholder in National, and on behalf of Monarch by Charles H. Land. William B. Land and Charles H. Land were brothers and both were minority partners in Monarch.

27. Georgia Pacific Corporation, which acquired all the stock of National after April 30, 1955, questioned the expense item of $28,089.17 which had been accrued and paid by National in 1955. After inquiry and investigation, Georgia Pacific Corporation was satisfied that the expense and accrual of this amount was proper.

28. Subsequent to April 30, 1955, National's independent auditors, Lester, Herrick and Herrick, also questioned the deductibility of the amount of $28,089.17. Upon examining the records of National and the invoice itself and having made inquiry of Monarch, the independent auditors were ultimately satisfied with the propriety of deducting such amount and approved the expense and accrual thereof in the year ending April 30, 1955 (deposition of Mary E. Lanigar).

29. In its federal income tax return for its taxable year ending April 30, 1955, National reported a net operating loss deduction in the amount of $47,371.-53. After examination, the Internal Revenue Service accepted this return as filed (Ex. 8). It also allowed and made a refund of $2,225.46 to National (Ex. 9) on account of a loss carryback in the amount of $7,418.20 to the prior year (Exs. C and D).

30. The amount of $28,089.17 paid by National to Monarch in April, 1955, was reported by Monarch as income received, and Monarch's partners paid a tax on their respective shares of such amount.

31. National at all times pertinent to this action was an accrual-basis taxpayer.

32. Koppers, as transferee of National, claims $39,953.33 of the net operating loss for the fiscal year ending April 30, 1955, as a carryover to National's fiscal year ending April 30, 1956, which claim has been disallowed.

### DISCUSSION

*National was entitled to a net operating deduction.*

The defendant argues that after the acquisition by Koppers, National was not engaged in the same trade or business as it was before, and, hence, under § 382(a) (1) (C), the net operating loss deduction should be disallowed. The defendant contends that National's "entire pre-acquisition business ceased" because it changed "from a service company to an inventoried, manufacturing unit of Koppers". (Defendant's brief, p. 20.)

Plaintiff does not dispute the fact that prior to the acquisition, National's activity was largely on a treating service basis, and admits that after the acquisition, National "treated its own material for the most part." (Plaintiff's reply brief, p. 11.)

It is the opinion of the court that plaintiff should prevail. The defendant stipulated that National was engaged in the wood treating business both before and after the acquisition of its stock by Koppers (pretrial stipulation, ¶ IV). Also, it appears that in the wood treating industry some companies treat their own wood and some treat wood owned by others (Ex. E), but only one business is involved (T., p. 53). We agree with plaintiff that a plant is not in one business when it derives the bulk of its income from treating and selling on account another's wood, and in a different business when it derives the bulk of its income from treating and selling its own wood. Neither the Code, the Regulations, nor the decisions give the slightest support to the proposition that the business must be carried on in substantially the same manner. The question is whether it is substantially the same business. We think the facts prove that it was. After the acquisition, National continued the functions of processor and seller of wood, i. e., poles, posts, and lumber, at the same location, with substantially the same plant and equipment, the same employees, and many of the same customers. Whether it sold treated wood on its own account or on account of Koppers, in either case there was a sales risk. We think the evidence indicates it did both (T., pp. 27–28, Ex. D).[16] The operation was substantially the same as in the past; its pre-acquisition business was certainly related to its post-acquisition business. The introduction of creosote, the "workhorse of the industry", and other types of preservatives, after the acquisition can hardly be deemed a significant deviation for a company engaged in the wood preserving business.

We think the facts here present a much stronger case in favor of the taxpayer than the facts in Goodwyn Crockery Company, 37 T.C. 355 (1961), aff'd by the Sixth Circuit, 315 F.2d 110 (1963).

*National's selling expenses in the amount of $28,089.17 are deductible.*

It seems that the parties agreed,[17] as we find from the evidence, that prior to the negotiations between William B. Land representing National and Charles H. Land representing Monarch, which culminated in the payment by National to Monarch of $28,089.17, there was no undertaking, obligation, agreement, or understanding, oral or written, to the

---

16. See Findings of Fact 12 and 13.

17. Defendant's brief, pp. 9, 13; plaintiff's reply brief, p. 2.

effect that National would reimburse Monarch for the services performed and expenditures made in prior years by Monarch for the benefit of National.

This unusual condition probably existed during the 46-month period from 1951 to 1955 because of the relationship which the Land brothers, as partners in Monarch, bore towards National and Feather River Pine Mills, Inc. (See agreement attached to Land's deposition.) Up to 1951, National had been losing money and the Land and Cooper families, the owners of Feather River, purchased National's stock in order to save it from bankruptcy. In 1951 and the years following, the tendency was to nurse National along. Notwithstanding this earlier disposition, when National's owners were about to sell their stock to Georgia Pacific Corporation in 1955, it dawned upon the Monarch partners that they were entitled to be reimbursed for these payments made in National's behalf and for its benefit.

. In this factual situation we conclude that the payment of $28,089.17 in April, 1955, was properly accrued and deducted in the year ended April 30, 1955, as ordinary and necessary business expense, since the payment was reasonable compensation for services which were valuable and actually rendered. The reasonableness of the expense was not contradicted by the defendant. There was no agreement or legal obligation to pay that expense prior to the 1955 negotiations and agreement between the Land brothers. "[T]he expense could not be attributed to earlier years, for it was neither paid nor incurred in those years. There was no earlier accrual of liability." Lucas v. Ox Fibre Brush Co., 281 U.S. 115, 120, 50 S.Ct. 273, 274, 74 S.Ct. 733 (1930). Cf. Noxon Chemical Products Co. v. Commissioner, 78 F.2d 871 (3d Cir. 1935); Waring Products Corp., 27 T.C. 921 (1957).

## CONCLUSIONS OF LAW

1. Jurisdiction is conferred upon this court pursuant to § 1346(a) (1), Title 28 U.S.C.A.

2. The action brought by Koppers for a refund is timely.

3. The deficiency in the sum of $25,089.41 was erroneously and illegally assessed and collected by defendant from Koppers.

4. National was entitled to a net operating loss deduction of $47,371.53 for the fiscal year ending April 30, 1955, and, after carrying back $7,418.20 of such loss against taxable income for the preceding taxable year, to carry over the remaining portion thereof, $39,953.33, against taxable income for the fiscal year ending April 30, 1956.

5. The net operating loss in the amount of $47,371.53 reported by National for its taxable year ending April 30, 1955 is a proper and deductible net operating loss in accordance with § 172 of the Internal Revenue Code of 1954, § 172, Title 26 U.S.C.A. Such net operating loss is allowable as a net operating loss deduction for National's taxable year ending April 30, 1956, to the extent it has not been utilized as a net operating loss carryback to any prior taxable year.

6. Following the acquisition of 100% of the stock of National by Koppers on July 25, 1955, National continued to carry on a trade or business substantially the same as that conducted prior to that date within the meaning of the provisions of § 382 of the Internal Revenue Code of 1954, § 382, Title 26 U.S.C.A. Therefore, the net operating loss carryover by National should not be disallowed under that provision of the Internal Revenue Code.

7. The plaintiff, Koppers, is entitled to a refund of $25,089.41, together with interest at the rate of 6% from January 8, 1960, and costs.