**COAST QUALITY CONSTRUCTION CORPORATION AND SUBSIDIARIES, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. 70-1072.**

United States District Court,
E. D. Louisiana,
New Orleans Division.
March 17, 1971.

21. *See, e. g.*, Wieman v. Updegraff, 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952).

A. J. Schmitt, Jr., New Orleans, La., for plaintiffs.

Gerald J. Gallinghouse, U. S. Atty., Claude J. Aucoin, Jr., Asst. U. S. Atty., for defendant.

RUBIN, District Judge:

This income tax refund suit presents only one issue: whether a corporation whose stock changed hands also made a substantial change in its business at the same time and therefore lost its right to carry forward net operating losses it had previously sustained because of the provisions of IRC Section 382, 26 U.S.C. § 382. Because there was in fact no substantial change in the corporation's business, the corporation was entitled to use its carry forward, and is entitled to the tax refund it seeks.

## FACTS

Charles Kornman was the sole stockholder of four corporations engaged in real estate development and residential home construction in and around New Orleans, La. Each corporation had a different function: Coast Quality was actively engaged in building houses; Sunrise Homes was engaged in real estate development and the sale of residential property; Quality Realty purchased unimproved real estate to hold for future development; and Kornman Realty held the necessary real estate broker's license although it did not actively engage in the brokerage business.

The companies were functionally related. Quality Realty acquired unimproved real estate, developed it, and subdivided it. As demand required, Quality transferred lots to Sunrise Homes. Sunrise Homes contracted with Coast Quality to build houses on these lots, and sold the completed residential unit to home buyers.

Kornman's brother and four of their friends were engaged in similar businesses in different geographic areas. Each of the six persons controlled one or more corporations. They developed a plan to pool their operations and thus increase their borrowing power and financial standing. So each transferred all the stock of his corporations to a Georgia corporation, Tremont, in exchange for roughly ⅙th of the Tremont stock. But each of them continued to run the business he had transferred.

Kornman also controlled a fifth corporation, Bayou Villa Estates. This company had acquired a tract of unimproved land near Covington, La., to develop in the same manner as Quality Realty was proceeding in the New Orleans area. Real estate business in the Covington area was slack, but Bayou Villa Estates did develop some lots, and, as demand warranted, it contracted with Coast Quality to build houses on them. Bayou Villa Estates then sold the improved property.

When Kornman conveyed the stock of his other corporations to Tremont, he transferred his share of the stock of Bayou Villa Estates, twenty-four per cent, to Tremont in exchange for Tremont stock.

Since Tremont was not formed as an operating entity, but merely for the purpose of providing access to capital and greater borrowing power for its constituent members, the corporations that were transferred to Tremont retained their separate identities and operated as subsidiaries or divisions of Tremont. The corporations that made up Kornman's organization before their transfer to Tremont continued to operate under his personal direction, and he, in turn, reported to Tremont's board of directors. Kornman was, of course, himself a member of that board of directors.

On September 30, 1963, Quality Realty, Sunrise Homes, Coast Quality Construction, and Bayou Villa Estates were merged into a subsidiary of Tremont then known as Sunrise Dale, which had been formed a few months before the merger. After the merger, the name of this corporation was changed to Coast Quality Construction Corporation to preserve and take advantage of the reputation, good will, and credit line that the corporation formerly known by that name had developed under Kornman's direction. After the merger, the new Coast Quality (which, with its subsidiaries, is the plaintiff in the instant suit) continued to operate all of the properties and businesses formerly operated by the four corporations that had originally belonged to Kornman, including the Covington project.

During the latter part of 1963 and the early part of 1964, a disagreement developed between Kornman and the other members of Tremont's board of directors. On May 5, 1964, Kornman met with Tremont's board of directors and formally proposed to exchange his stock in Tremont for the stock of Coast Quality. After some discussion, it was agreed that the exchange would be consummated and that Coast Quality could retain all of the properites it then owned in Louisiana.

However, there were now first and second mortgages on the Covington property that had belonged to Bayou Villa Estates and the first mortgage had been personally endorsed by the six shareholders in Tremont. (The evidence at the trial didn't indicate whether or not the second mortgage was endorsed.) The endorsers were understandably reluctant to let Kornman go his own way with this property so long as their liability continued. Therefore, the parties agreed that Coast Quality Construction would transfer the Covington property to another subsidiary of Tremont in consideration for Tremont's assumption of the first and second mortgages, and certain inter-company accounts then owed by Coast Quality. The transfer from Coast Quality to the Tremont subsidiary occurred on May 14, 1964, and, the following day, Tremont exchanged its stock in Coast Quality for Kornman's stock in Tremont. As a result of this exchange, Kornman reported a taxable long-term capital gain of $56,000 on his 1964 personal income tax return.

At the time Kornman acquired all of the stock of Coast Quality, its principal assets consisted of approximately 125 lots in the Willowdale Subdivision of New Orleans and a 22-acre tract zoned for apartments which the corporation had acquired while it was a Tremont subsidiary. These were assets of the same kind that had belonged to Kornman's corporations before Tremont was formed and Coast Quality continued to engage in the same kind of business activities it had previously conducted, in the same geographic area, and with the same personnel. The Covington property had constituted approximately 44 percent of Coast Quality's total assets prior to their transfer, and, of course, it was no longer in the corporation.

On May 15, 1964, Coast Quality and its subsidiaries had accrued net operating loss carryovers totaling $288,178, in ad-

dition to $10,279 that was useable by Tremont.[1] Of this, $258,876 was attributable to net operating losses incurred in connection with the Covington property operation. It is normal in this type of business operation to sustain losses on a newly acquired tract of land for several years because of interest and tax payments, deductible development costs, and similar charges. As development proceeds and lots are sold, it is hoped a profit will be realized.

The Covington property operation (Bayou Villa Estates) was an integral part of Kornman's total business operations. Like Quality Realty, it provided a reserve supply of unimproved land and an inventory of developed lots for the construction of residences and the sale of residential properties.

Kornman's apprehensions about Tremont proved well founded. In 1966, it went into receivership. Business reasons alone motivated his entrance into and departure from Tremont. There is no evidence that the income tax effect of the merger or the split up were ever considered, or that the possibility of a net operating loss carry forward was ever relied on by Kornman or any other party to the transactions.

After Kornman acquired control of Coast Quality from Tremont, it continued the same business it had always engaged in: land development and residential construction. It continues to conduct the same business today.

The land owned by Coast Quality when Kornman reacquired its stock was developed and houses were built on the lots. Kornman had been negotiating to buy more land before the stock reacquisition, and Coast Quality purchased it and developed it in its customary manner.

## ISSUE

The government does not contend that the reacquisition of plaintiff's stock in 1964 had as its principal purpose the avoidance of taxes. Accordingly, the applicability of Internal Revenue Code Section 269, 26 U.S.C. § 269, is not at issue.

The government does, however, contend that the net operating losses of plaintiff incurred before the reacquisition date are not available to it on the theory that the retention of the Covington property by Tremont, subjects the transaction to Sec. 382(a) (1) (C) treatment in that plaintiff "has not continued to carry on a trade or business substantially the same as that conducted before" the reacquisition. 26 U.S.C. § 382(a) (1) (C).

## DISCUSSION

Section 382(a) provides in part:

(a) *Purchase of a Corporation and Change in Its Trade or Business.—*

(1) *In general.* If, at the end of a taxable year of a corporation—

(A) any one or more of those persons described in paragraph (2) own a percentage of the total fair market value of the outstanding stock of such corporation which is at least 50 percentage points more than such person or persons owned at—

(i) the beginning of such taxable year, or

(ii) the beginning of the prior taxable year,

(B) the increase in percentage points at the end of such taxable year is attributable to— .

(i) a purchase by such person or persons of such stock, the stock of

1. The computation was as follows:

| | |
|---|---|
| Coast Quality | $297,963 |
| Kornman Realty | 494 |
| | 298,457 |
| Amount of N.O.L. | |
| Useable by Tremont | 10,279 |
| Remainder | 288,178 |

another corporation owning stock in such corporation, or an interest in a partnership or trust owning stock in such corporation, or

(ii) a decrease in the amount of such stock outstanding or the amount of stock outstanding of another corporation owning stock in such corporation, except a decrease resulting from a redemption to pay death taxes to which section 303 applies, and

(C) such corporation has not continued to carry on a trade or business substantially the same as that conducted before any change in the percentage ownership of the fair market value of such stock, the net operating loss carryovers, if any, from prior taxable years of such corporation to such taxable year and subsequent taxable years shall not be included in the net operating loss deduction for such taxable year and subsequent taxable years.

■ To carry on the same business that it conducted previously, however, a company need not continue to own exactly the same inventory. As the Regulations indicate, the crucial question is whether there is a continuation of the same business enterprise. This is to be determined by taking "all the facts and circumstances of the particular case * * * into account." Regs. 1.382(a) (1) (h) (5). That same regulation continues:

Among the relevant factors to be taken into account are changes in the corporation's employees, plant, equipment, product, location, customers, and other items which are significant in determining whether there is, or is not, a continuity of the same business enterprise. These factors shall be evaluated in the light of the general objective of section 383(a) to disallow net operating loss carryovers where there is a purchase of the stock of a corporation and its loss carryovers are used to offset gains of a business unrelated to that which produced the losses. However, the prohibited utilization of net operating loss carryovers to offset gains of a business unrelated to that which produced the losses is not dependent upon considerations of purpose, motive, or intent, but rather is established by the objective facts of the particular case. The principles set forth in this subparagraph shall be applied in accordance with the rules set forth in the following subparagraphs of this paragraph.

\*　　\*　　\*　　\*　　\*　　\*

(7) A corporation has not continued to carry on a trade or business substantially the same as that conducted before an increase in the ownership of its stock if the corporation discontinues more than a minor portion of its business carried on before such increase. In determining whether the discontinued activities are more than "minor" for purposes of the preceding sentence, consideration shall be given to whether the discontinuance of the activities has the effect of utilizing loss carryovers to offset gains of a business unrelated to that which produced the losses. \* \* \*

Coast Quality's management, employees, plant equipment, and product remained unchanged after the transfer of its stock to Kornman. Its customers were drawn from the same source, prospective homeowners. Part of its sales, those in the Covington area, terminated, but Coast Quality's home office remained the same. Unless Coast Quality's gains and losses from each separate subdivision it developed constitute a separate business, it continued to operate the same business that it had always conducted. It did not discontinue any part of its business, although of course it had no Covington lots to sell. It did not start any new businesses to offset previous losses. It merely sold what it could, when it could, depending upon the fluctuations in the housing market and the supply of available mortgage money to home buyers.

■ Hence we do not have a situation where the business activities of Coast

Quality were changed. (Compare The Clare Company, 1969, 28 T.C.M. 1348, where the construction business was terminated and a barge rental business commenced and Euclid-Tennessee Inc. v. Commissioner of Internal Revenue, 6 Cir. 1955, 352 F.2d 991, where operation of a brewery was discontinued and the sale and servicing of construction equipment begun.) As long as the basic character of a business remains unchanged, it continues to be substantially the same. Goodwyn Crockery Co. v. Commissioner of Internal Revenue, 1961, 37 T.C. 355, aff'd 6 Cir. 1963, 315 F.2d 110.

Nor is it necessary that a business be carried on in the same way for it to be substantially the same. Koppers Co., Inc., v. United States, W.D.Pa.1964, 229 F.Supp. 159. If it were, good management would be helpless to change past practices to revive a failing operation. "[S]ome changes in the conduct of business are permissible * * * as long as the same type of business continues." See The Clare Co., T.C. Memo 1969, 264. Coast Quality clearly continued to conduct the same type of business after it was divorced from Tremont that it had always carried on.

It cannot be said that the Covington tract was a separate business within the meaning of Regs. 1.382(a)–1(h) (7). The Covington property was simply another tract of unimproved land held for development. The tract of land was not a business.

Regs. 1.382(a)–1(h) (7) applies to a situation where a corporation is engaged in several different and distinct types of businesses and one of the "loss" businesses is discontinued when the ownership of the corporation changes. This subparagraph prevents such losses from being used to offset future profits of a separate and distinct business unrelated to the one that produced the losses.

In explaining Internal Revenue Code Sec. 382 and the Regulations thereunder, Merten's Law of Federal Income Taxation, Code Commentary Volume states that the Regulations test the application of the codal language by an overall objective imported from the "continuity of business enterprise" principle of the *Libson Shops* case, Libson Shops v. Koehler, 1957, 353 U.S. 382, 77 S.Ct. 990, 1 L.Ed.2d 924: the objective is "to disallow net operating loss carry-overs where there is a purchase of the stock of a corporation with losses for the purpose of using its loss carry-overs to offset gains of a business *unrelated* to that which produced the losses." *Merten's* further explains the application of Regs. 1.382(a)–1(h) (7) as follows:

"(2) If the corporation discontinues more than a minor portion of its business carried on before the change in stock ownership, it will be deemed to have made a sufficient change in trade or business. The Regulations apply the term 'minor' not in the quantitative sense, but in the sense of the principle of business continuity described above, ascertaining whether the discontinuance of activities has the effect of making loss carryovers available to off-set gains from a business unrelated to that which produced the losses."

Since Coast Quality continuously remained in exactly the same business of land development and construction, the Regs. 1.382(a)–1(h) (7) do not prevent discontinuance of the development of the Covington property. For, as has been held in another connection, the mere reduction in the extent of a taxpayer's operations is not a change in the nature of its operations. United States v. Northern Railroad, 1 Cir. 1964, 334 F.2d 936.

For these reasons, judgment will be entered in plaintiff's favor. The plaintiff will prepare a form of judgment and submit it to opposing counsel for consideration as to amounts due and other items. If these cannot be agreed on, the disputed issues will be submitted to the court.

This opinion will serve in lieu of findings of fact and conclusions of law.