**COMMISSIONER OF INTERNAL REVENUE, Petitioner,**

**v.**

**GOODWYN CROCKERY COMPANY, Respondent.**

**No. 15040.**

United States Court of Appeals Sixth Circuit.

March 28, 1963.

Norman H. Wolfe, Dept. of Justice, Washington, D. C., for petitioner, Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, I. Henry Kutz, Dept. of Justice, Washington, D. C., on the brief.

Alvin L. Prichard, Sr., Louisville, Ky., for respondent, Ernest Woodward, II, Alvin L. Prichard, Sr., John P. Sandidge, Woodward, Hobson & Fulton, Louisville, Ky., on the brief.

Before WEICK, Circuit Judge, and BOYD and THORNTON, District Judges.

WEICK, Circuit Judge.

The only question in this case is whether the corporate taxpayer, Goodwyn Crockery Company, was entitled to a deduction, in its income tax computations, for net operating loss carryovers from the earnings of the business it conducted after the sale of its outstanding shares of capital stock to a new owner. This depended on whether Goodwyn, within the meaning of Section 382(a) (1) (C) of the Internal Revenue Code of 1954, "continued to carry on a trade or business substantially the same as that conducted before * * *" the change of ownership of its shares. 26 U.S.C. 1958 ed. § 382(a) (1) (C).

The Tax Court found, as an ultimate fact, that taxpayer had continued to carry on its business substantially the same after as before the change of ownership and allowed the deduction, Judges Tietjens and Opper dissenting.

The Commissioner has petitioned for review of the decision of the Tax Court on the ground that its findings as to the ultimate fact and part of the subsidiary facts are clearly erroneous.

There was no substantial dispute as to the facts. Some of the facts were stipulated in the Tax Court and evidence was received.

Prior to the change of ownership, Goodwyn had been engaged as a wholesaler of durable household goods in Memphis, Tennessee. It handled glassware, dishes, aluminum ware, kitchen utensils, tableware, garden hose and small electrical appliances. It employed about 15 persons including 5 salesmen. Its business extended to parts of Illinois, Missouri, Tennessee, Arkansas and Kentucky where it served several hundred independent small businessmen as customers within about 150 miles of the Memphis area. Its operations were successful during the lifetime of the owner of its principal shares. After the death of the principal owner, the business was conducted by his widow and substantial losses were sustained for several years thereby depleting its inventory. A manager was finally hired who made compositions with creditors by promising them more business. A sale of all of the outstanding shares of the capital stock of Goodwyn was then made to J. L. Turner & Son, a corporation, of Scottsville, Kentucky, for $65,000.00. Turner was a wholesaler of dry goods.

Within a month after acquiring the shares, Turner caused Goodwyn to purchase for $60,000 a stock of merchandise from Weber Dry Goods Co. of Cairo, Illinois and furnished the money therefor. Weber was a wholesaler of wearing apparel and dry goods and operated in substantially the same territory as Goodwyn. As part of the consideration Goodwyn was required to and did lease Weber's building in Cairo for two years. Goodwyn then transferred its office from

Memphis to Cairo because it believed that Cairo made a better distribution center; that it would have less competition there and could effect economies in operations. Goodwyn's manager and a bookkeeper were the only employees who went to Cairo. Goodwyn hired Weber's salesmen. The bookkeeper remained for only a few months.

Operations in Cairo continued for nearly a year. Goodwyn maintained an inventory of housewares substantially the same as before. Weber had carried only a few items in this category such as window shades and oil cloth. Goodwyn had not previously sold dry goods. In general, the territory served remained the same.

In making the move to Cairo, Goodwyn lost customers in Memphis because it could not meet competition on account of freight rates. It secured customers who had dealt with Weber and also new customers in the Cairo area. It retained about 40% of its own customers.

After several months Goodwyn commenced to operate retail dollar general stores. Later operations were transferred from Cairo to Scottsville, Kentucky because Turner was not satisfied with Cairo and wanted to give closer supervision and effect further economies. Goodwyn continued to pay rent under the Weber lease. Shortly thereafter Goodwyn opened a retail store in its Memphis building. It also used the basement of its building as a warehouse and transshipment point for merchandise originating south of Memphis. Most of Goodwyn's sales were to Turner subsidiaries but later its business developed to such an extent that 40% of the sales were to customers outside the Turner organization. At the time of the move to Scottsville the great bulk of Goodwyn's business was in the dry goods line and only a small fraction in durable goods. Its sales of durable goods have since increased, however, so that at the time of the trial they were in excess of $2,000,000 a year. Goodwyn used its delivery trucks and office equipment in Cairo and Scottsville. Goodwyn's operations now are well integrated with Turner's. In several years of operation, Turner put $150,000 in cash in the business of Goodwyn which included the $60,000 advance to purchase Weber's assets. During the tax years in question (1956–1958) Goodwyn's operations were successful, producing earnings from which it sought to deduct the net operating loss carryovers accruing during the operations by the widow.

The Commissioner argued that Goodwyn shifted from one type of business to another; that it discontinued more than a minor portion of its business; that it changed its location and its employees and failed to carry on substantially the same trade or business as was conducted before the change of ownership of its shares.

As pointed out by the Tax Court, Goodwyn did take on a new line, namely, dry goods, but it still continued at all times to handle housewares. In our opinion, a wholesaler may still carry on the same business even though it may add an additional line of merchandise. Goodwyn's inventory of housewares was small, but this condition existed at the time of the change in ownership. While Goodwyn did shift its principal office it remained within the area of its original territory. We do not think selling partially at retail, instead of entirely at wholesale, would substantially change its business as a merchandiser. Goodwyn retained its corporate name, its real and personal assets and some of its customers. It has the same line of merchandise with the additional line of dry goods. Of Goodwyn's employees, the manager is the only one who remained. The other employees were given an opportunity to go to Cairo, but they were elderly people and probably did not want to leave their homes. Furthermore, the manager may have wanted to replace at least some of them with younger employees.

We do not obtain much help from the legislative history of Section 382. Congress used the word "substan-

tially," but did not define it. We do not think that the business had to be conducted exactly the same after as before the change or the word substantially would not have been used. There may be some difference.

The Commissioner has cited Proposed Treasury Regulations on Income Tax (1954 Code), Sec. 1.382(a)—1 et seq., 25 Fed.Register, Part 13, pp. 13775, 13778–13780. These regulations were not promulgated until October 30, 1962 and then with certain minor changes were published in the Federal Register for November 3, 1962. 27 Fed. Register, 10733–10741. Since the regulations were not in effect at the time the tax liability accrued, or at the time of the hearing, they have no binding force here. They are authority, however, as a departmental ruling.

In order to reach a conclusion on the ultimate fact in this case the Tax Court had to consider and weigh all the evidence and draw inferences therefrom including inferences from the stipulated facts. The dissenting judges drew inferences which were different from those drawn by the Tax Court. They were of the view that when all of the changes in operation were considered in the aggregate instead of separately, that Goodwyn did not continue to carry on its business substantially the same before as after the sale of its share.

Unlike the Tax Court and the dissenting judges, we are not permitted to draw factual inferences from the evidence or even from undisputed basic facts. Commissioner v. Duberstein, 363 U.S. 278, 80 S.Ct. 1190, 4 L.Ed.2d 1218. We are bound by the inferences drawn by the Tax Court unless we find them clearly erroneous. We are also bound in a similar manner by ultimate facts found by the Tax Court. Rudolph v. United States, 370 U.S. 269, 82 S.Ct. 1277, 8 L.Ed.2d 484.

This is a very close case and rests almost entirely on the facts found by the Tax Court. While we are not prepared to state that we would, if permitted, have made the same findings as were made by the Tax Court upon the evidence in this case, we are unable to say that these findings are clearly erroneous.

The decision of the Tax Court is, therefore, affirmed.