**EUCLID–TENNESSEE, INC., Petitioner,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**No. 15993.**

United States Court of Appeals
Sixth Circuit.

Dec. 2, 1965.

William Waller, Nashville, Tenn., Robert G. McCullough, Nashville, Tenn., on brief; Waller, Lansden & Dortch, Nashville, Tenn., of counsel, for petitioner.

Norman H. Wolfe, Department of Justice, Washington, D. C., Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Atty., Department of Justice, Washington, D. C., on brief, for respondent.

Before O'SULLIVAN, Circuit Judge, and CECIL and McALLISTER, Senior Circuit Judges.

O'SULLIVAN, Circuit Judge.

By its petition Euclid-Tennessee, Inc., seeks reversal of a Tax Court determination that Section 382(a) (1), of the In-

ternal Revenue Code of 1954,[1] 26 U.S. C.A. § 382(a)(1), prohibited its carryover of losses sustained in the brewing business to offset profits later made in the heavy equipment business after a complete change in the ownership of the taxpayer corporation. The opinion of the Tax Court is reported as Euclid-Tennessee, Inc., v. Commissioner, 41 T.C. 752 (1964).

### 1. The facts.

█ The record in the Tax Court was for the most part made from stipulated facts, supplemented by oral testimony which presented substantially no factual issues other than the ultimate factual inference drawn by the Tax Court. To the extent that its decision rests thereon, we must accept the Tax Court's final inference of fact unless we find it clearly erroneous. Duberstein v. Commissioner, 363 U.S. 278, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960). Being of the opinion that the Tax Court was not wrong in its construction of the applicable statute, nor clearly erroneous in its finding of facts, we affirm.

The Tax Court opinion details the facts. We repeat some of them to the extent necessary to expose our reasons for sustaining the Tax Court. From 1931 until 1954, the taxpayer, originally named the William Gerst Brewing Company, carried on the brewery business in Nashville, Tennessee. In 1954, after several years of heavy losses, it abandoned such enterprise. In that year it sold all of the equipment theretofore used in the brewery business but continued the corporate life of the brewery for the purpose of liquidating its real estate. In 1957 there was a corporation named Euclid-Tennessee, Inc. profitably engaged in the business of selling and servicing construction equipment. Its plant was also in Nashville. This company, herein sometimes called Old Euclid, became aware of the net operating losses then available to the Gerst Brewing Company as carryover tax deductions from profits. Old Euclid's awareness of this situation coincided with its knowledge in 1957 that a highway development might take some of its plant site and require the relocating of it. This need was asserted as at least part of the motivation for acquiring the property of the abandoned brewery.[2]

1. § 382. Special limitations on net operating loss carryovers

(a) Purchase of a corporation and change in its trade or business.—

(1) In general.—If, at the end of a taxable year of a corporation—

(A) any one or more of those persons described in paragraph (2) own a percentage of the total fair market value of the outstanding stock of such corporation which is at least 50 percentage points more than such person or persons owned at—

(i) the beginning of such taxable year, or

(ii) the beginning of the prior taxable year,

(B) the increase in percentage points at the end of such taxable year is attributable to—

(i) a purchase by such person or persons of such stock, the stock of another corporation owning stock in such corporation, or an interest in a partnership or trust owning stock in such corporation, or

(ii) a decrease in the amount of such stock outstanding or the amount of stock outstanding of another corporation owning stock in such corporation, except a decrease resulting from a redemption to pay death taxes to which section 303 applies, and

(C) *such corporation has not continued to carry on a trade or business substantially the same as that conducted before any change in the percentage ownership of the fair market value of such stock,* (emphasis supplied) the net operating loss carryovers, if any, from prior taxable years of such corporation to such taxable year and subsequent taxable years shall not be included in the net operating loss deduction for such taxable year and subsequent taxable years.

2. While such need for a new plant site was relied upon as Old Euclid's motivation for taking over the brewery, there was evidence from one of its principal officers that in late 1956 he had made a trip to New York to attend a conference concerning loss carryovers. There was also evidence that in March, 1957, the month in which the corporate maneuvers here involved commenced, a change in the high-

The brewery corporation in the two and one-half years following the closing of the brewery rented its real estate but continued to suffer losses. It was stipulated that this real estate "was always for sale and there was no intention of engaging in this owning and leasing business if the property could be sold advantageously."

In March, 1957, Old Euclid, through an agent, offered to buy the corporate shares of Gerst Brewing. A condition of the offer was that Gerst Brewery would first change its corporate name either to Sixth Avenue Properties or South Nashville Properties, Inc. The offer was accepted by Gerst Brewing shareholders, but the purchase was not consummated by Old Euclid. Instead a new holding corporation, Trippeer Industrials Corp., was organized by Old Euclid shareholders. Their stock subscriptions to Trippeer were paid for by exchanging all of the stock of Old Euclid for all of the stock of Trippeer. Trippeer then accepted the offer that the Gerst Brewing shareholders had made to Old Euclid's agent and acquired such stock. Gerst Brewing had fulfilled the condition of the offer of purchase by changing its name to South Nashville Properties, Inc.[3] When this step was accomplshed, Trippeer for an interval owned two subsidiaries—Old Euclid, (the profitable machinery business) and South Nashville Properties, Inc. (the old brewery).

As a next step Trippeer donated all the stock of Old Euclid to South Nashville Properties, Inc. This was followed by corporate action which merged Old Euclid into South Nashville Properties, Inc. Thus the latter company became the owner of the profitable machinery business of Old Euclid and continued to own the remnant assets of the former brewery. The former shareholders of Old Euclid now owned a corporation with a past experience of substantial net operating losses which, if permitted by the Internal Revenue Code, could be carried over as deductions from the profits to be earned in the machinery business. To round out the program, South Nashville Properties, Inc. changed its name to Euclid Tennessee, Inc., and its corporate address to 720 Murfreesboro Road (Old Euclid's unchanged plant site) and changed the purposes clause in its charter to the clause which had been in the charter of Old Euclid; the charter purpose was also expanded to permit dealing in real estate. All of this was accomplished in the months of March and April, 1957. Thereafter the taxpayer attempted to carry over the losses suffered in the brewery business and deduct them from the substantial profits of the machinery business.[4] The Commissioner of Internal Revenue resisted and thus we have this lawsuit.

The primary purposes (and results) of the transactions just described may be

way project obviated any need for moving Old Euclid's plant. In all events, Old Euclid did not move its plant and the taxpayer which is an extension of the corporate entity which was once a brewery operates out of such plant.

3. This change of name had the obvious purpose of giving to the old brewery company the appearance of a company already operating in the business of holding and leasing real estate. It should be mentioned that Gerst Brewery's recorded corporate purpose had never encompassed such an activity, although Tennessee law permitted all corporations to hold and lease real estate.

4. The advantages of this total enterprise if successful is illustrated by comparing the post-merger relationship of gross

rentals from the old brewery property to the gross sales in the machinery business in the tax years here involved. In 1957 gross sales were $1,941,214.19 and gross property rentals were $26,572.45; in 1958 they were $2,722,333.61 and $21,099.96, respectively; and in the first nine months of 1959, $3,663,850.62 and $13,360.39. This review demonstrates the insignificance of the proceeds of the use of the brewery property (in part by taxpayer's affiliates engaged in allied activities) to petitioners overall operations—rental income was 0.71 percent of total sales and the remaining 99.29 percent from the machinery and heavy equipment business. In the years in question, taxpayer reported net operating loss carryovers of $133,943.77, $99,072.91 and $115,114.69, respectively.

summarized as follows: The brewery's former shareholders disposed of its remaining assets by selling their stock. Shareholders of the purchaser then determined, by using a short lived holding company, to pluck their successful machinery business from its former shell and, by donation and merger, shoe-horn it into the corporate entity of the defunct brewery. Aside from possible loss carry-overs, the result was precisely the same as would have been accomplished by an outright purchase of the real estate of the inoperative brewery. However, there was nothing illegal or immoral in the circuity of the maneuvers employed. The question is whether what they accomplished met the requirements of § 382 (a) (1) (C), thus to permit enjoyment of the tax advantage claimed.

### 2. The rule to be applied.

Conditions justifying the Commissioner's disallowance of the deductions here involved are present if the Tax Court's decision can be fairly read as a finding that "such corporation [the taxpayer] has not [following the merger] continued to carry on *a* trade or business substantially the same as that conducted before any change * * *." (§ 382(a) (1) (C)), and if such finding was warranted by the evidence. The Tax Court opinion includes what it terms its Ultimate Finding as follows:

> "Petitioner did not continue to carry on substantially *the* same trade or business after the acquisition of its stock by Trippeer."

■ We believe that the Tax Court's substitution of "the" in its Ultimate Finding for the "a" of the statute could, standing alone, be an impermissible extension of the conditions which must be satisfied to allow use of net operating losses as carryover deductions. Such substitution might indeed require that, after the change of ownership, a corporation's overall operations must be such as to be in total "substantially *the* same trade or business" as theretofore carried on.

This requirement would be more severe than the judicial rule developed under the 1939 Code and the Treasury Regulations under the present 1954 Code.[5] But notwithstanding the language of its ultimate finding, we read the entirety of the Tax Court's opinion as a finding that the post-merger renting and holding of what was the old brewery real estate as an insignificant incident to taxpayer's whole purpose was not the carrying on of "a trade or business substantially the same as that conducted [by the brewery] before [the merger]", i. e. holding and renting its remnant assets awaiting complete liquidation of what was the Gerst Brewing Company. Were we to indulge the view that Gerst Brewing Company's holding and renting of its remnant assets constituted "*a* trade or business," we do not find error in the Tax Court's view that the taxpayer machinery company's use of such assets was not "a trade or business" having any existence as an enterprise "substantially the same as that conducted" by the defunct brewery in winding up its affairs.

■ We have recently had occasion to review decisions denying the use of pre-merger losses in one line of endeavor to offset postmerger profits from a different enterprise under the 1939 Code. Fawick Corp. v. Commissioner, 342 F.2d 823 (CA 6, 1965). We there discussed Libson Shops, Inc. v. Koehler, 353 U.S. 382, 77 S.Ct. 990, 1 L.Ed.2d 924 and the cases that followed it. We cannot and do not read Libson into the 1954 Code, but its broad principles may be relevant except as the 1954 Code, under limited conditions, permits what the 1939 Code, construed by Libson, forbade. The Congressional purpose in enacting the statute here involved was to prevent "the purchase of the stock of a corporation with a history of losses for the purpose of using its loss carryovers to offset gains of a business unrelated to that which produced the losses." S.Rep.No. 1622, 83d Cong., 2d Sess., p. 53, 3 U.S.Code Cong.

---

5. See Treas. Reg. § 1.382(a)—1(b) (8). Cf. Commissioner of Internal Revenue v. Goodwyn Crockery Co., 315 F.2d 110, 112 (CA 6, 1963).

& Adm. News 4621, 4684 (1954). See also Treas. Reg. § 1.382(a)—1(b) (5) (1962). We think that such Congressional purpose was served and that its strict language is not violated by the Tax Court's decision.

We affirm the judgment of the Tax Court.