**GLEN RAVEN MILLS, INC., FORMERLY GLEN RAVEN COTTON MILLS, INC., SUCCESSOR BY MERGER TO ASHEVILLE HOSIERY COMPANY, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT**

Docket No. 4495–70.    Filed October 2, 1972.

*Joseph Warren III* and *Mark B. Edwards*, for the petitioner.
*Ocie F. Murray, Jr.*, for the respondent.

IRWIN, *Judge:* Respondent determined deficiencies in the income taxes of Asheville Hosiery Co. of $42,275.45 and $85,504.28 for the calendar years 1964 and 1965, respectively. Petitioner has conceded that a claimed loss deduction was not allowable. Accordingly, the single issue remaining for decision is whether Asheville Hosiery Co. was prevented by either section 382 or section 269 [1] from deducting prior period net operating losses during the years in issue.

---

[1] All statutory references are to the Internal Revenue Code of 1954, as amended.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

Petitioner is Glen Raven Mills, Inc., a corporation which acquired the business by merger of Glen Raven Knitting Mills, Inc., on April 29, 1967.

Glen Raven Knitting Mills, Inc. (hereafter Glen Raven), had its principal office at Glen Raven, N.C. During the years in issue and for years prior thereto, Glen Raven was actively engaged in the manufacture of yarns, hosiery, and knit products.

Asheville Hosiery Co. (hereafter Asheville) filed U.S. Corporation Income Tax Returns for the taxable years 1964, 1965, and 1966 with the district director of internal revenue, Greensboro, N.C.

Glen Raven filed U.S. Corporation Income Tax Returns for its fiscal years ended near April 30, 1963, 1964, 1965, 1966, and 1967, with the district director of internal revenue, Greensboro, N.C.

Asheville never filed a consolidated U.S. Corporation Income Tax Return with Glen Raven or any other corporation controlled by it or by the parties which control it.

On May 12, 1964, Glen Raven acquired the outstanding capital stock of Asheville for a price which, after subsequent adjustments, was $152,467.19. From that date until after the close of business on December 31, 1966, when it was merged into its parent, Asheville operated as a subsidiary of Glen Raven.

*Glen Raven's knit-de-knit operation.*—During 1962, Glen Raven undertook commercial production of knit-de-knit or crimped yarn utilizing the Bucaroni knit-de-knit process. Under this process yarn is first knit into a circular or open-width fabric and then placed in a heat chamber where a crimp is set into the fabric. The fabric is then cooled and unraveled or de-knit, but because of the memory characteristics of the synthetic fiber the resulting yarn retains its crimp after being knit into the final fabric. The crimped yarn was used in making hosiery and outerwear.

The knit-de-knit process was developed in the early 1940's in Europe, but Glen Raven could manufacture its yarn without payment of any royalties. Over the years Glen Raven used a variety of knitting machines to produce the fabric used in the knit-de-knit process. These machines included full-fashioned knitting machines, single-feed, seamless knitting machines, Scott and Williams 10-head knitting machines, and ribbers.

In the early 1960's full-fashioned hosiery (ladies' stockings which had seams) was being displaced in the marketplace by seamless hosiery. Accordingly, full-fashioned knitting equipment was readily available and inexpensive to purchase. Glen Raven discovered during

the same period a method by which full-fashioned knitting machinery could be converted for use in making fabric for its knit-de-knit operations. This method was to Glen Raven's knowledge unique and it desired to keep such use of full-fashioned machinery a secret.

Although knit-de-knit fabric was becoming increasingly popular during the early 1960's, the management of Glen Raven believed that there was a strong likelihood that the fabric was merely a fad and that demand for it could disappear without warning. The management decided to concentrate Glen Raven's knit-de-knit operations on the full-fashioned machine because this machine was readily available and cost about one-eighth as much initially as the more modern Scott and Williams 10-head machine while producing nearly as much fabric per week as the newer machine. There were, however, limitations to the practical use of the full-fashioned machinery in that a full-fashioned machine occupied considerably more plant space than a Scott and Williams machine. In addition, used full-fashioned machines could only be moved with great expense and difficulty.

By the spring of 1964, Glen Raven's knit-de-knit line had become its most profitable operation, and Glen Raven sought out ways to increase its production of the crimped yarn. Glen Raven bought six full-fashioned knitting machines from Fred Powell at Joyce Knitting Mills in Anderson, S.C., and made an arrangement with him under which he operated the machines in his own plant. Glen Raven paid Joyce Knitting Mills 15 to 18 cents a pound to knit yarn into fabric. Glen Raven also had an arrangement with G. Marvin Holt to knit 520-denier yarn into fabric on ribber knitting machines. Holt had purchased 60 used ribber machines for about $125 each and had 15 of them in operation when Glen Raven stopped purchasing fabric from him after purchasing Asheville. Holt received about 17 to 20 cents per pound for knitting yarn into fabric.

Petitioner had an additional source of fabric for its knit-de-knit operations in 1964 in the Griffin Tubing Co. From February 14, 1964, to July 21, 1964, this company produced 115,666.4 pounds of knitted fabric for Glen Raven on its ribber machines. Although Griffin could knit yarns of all gauges, most of the yarn knitted appears to have been 520 denier. Glen Raven paid between 10 and 18 cents per pound for the fabric knitted by Griffin.

In addition to obtaining fabric from outside suppliers, Glen Raven also attempted to increase its own production of fabric by acquiring knitting machinery. Glen Raven purchased a number of used full-fashioned machines in 1963 and 1964. Some of these were moved to Glen Raven's Altamahaw plant while others were stored with the seller pending completion of construction of additional plant space. Between October 22, 1962, and July 16, 1964, Glen Raven ordered thirty-nine 10-head yarn machines from Scott and Williams. These

machines were all shipped without undue delay and, except for three machines, were placed in service in Glen Raven's Newland plant. In 1964 and 1965 Glen Raven constructed substantial additions to this plant.

Glen Raven's books and records reflected its sales and inventory of knit-de-knit yarn to be as follows for its 52–53-week taxable years ended near April 30:

|  | 1963 | 1964 | 1965 | 1966 |
|---|---|---|---|---|
| Sales | $1,175,060 | $6,021,380 | $6,337,579 | $5,659,574 |
| Inventory of de-knit yarn | 256,527 | 601,628 | 693,142 | 699,333 |

Despite the availability of knitted fabric from outside suppliers and its ongoing program of acquiring knitting machinery and expanding plant capacity, Glen Raven still felt that its own production facilities for producing fabric for the knit-de-knit operation were inadequate. In April 1964, Glen Raven was backordered by about 700,000 pounds of finished knit-de-knit yarn.

*Glen Raven's acquisition of Asheville.*—John T. Rodgers was president of Ashville Hosiery Co. prior to May 12, 1964, and owned approximately 92 or 93 percent of the stock of that company. In the early part of 1964, Asheville was having serious financial difficulties. Its stockholders had made unsuccessful attempts to dispose of the business. John T. Rodgers was upset and worried a good bit about the outcome of the business. Some of his associates were sick and in the hospital and he felt that he could not carry it on any further. The prospects looked very poor for Asheville, and prices for its products were getting lower during this period.

Arthur Rogers, vice president of Glen Raven in charge of production, learned from Jack Leath that Asheville had used hosiery equipment available. During the early part of 1964, Arthur Rogers contacted John T. Rodgers, and they had a telephone conversation regarding the purchase of four full-fashioned knitting machines by Glen Raven from Asheville. After agreeing to purchase four machines, Arthur Rogers told John T. Rodgers that it was not necessary that the machines be inspected, and that he would not come to look at them, but that he would rely on John T. Rodgers to select the machines for them. Arthur Rogers told John T. Rodgers that they would take the machines if he would hold them long enough for them to put up a building. He stated that they had already excavated for the building and had plans set to put up the building quickly. Arthur Rogers thought they could have it ready within a few weeks. John T. Rodgers agreed to hold the machines until that time.

John T. Rodgers later called Arthur Rogers and told him that he was interested in disposing of his entire business, the assets of which consisted of a building and 26 full-fashioned knitting machines and 91 seamless-hosiery knitting machines.

Sometime after these conversations, Arthur Rogers put John T. Rodgers in touch with other officers of Glen Raven. John T. Rodgers went to the offices of Glen Raven where he met with President Allen Gant, Comptroller Harold Daniel, and Treasurer Roger Gant, Jr. At these discussions, John T. Rodgers had with him the annual statements of Asheville for the years 1961, 1962, and 1963 which had been prepared by Robert C. Freeland, a certified public accountant. Allen Gant took these financial statements and left John T. Rodgers and went into a backroom in the office of the building.

These financial statements reflected the net operating losses of Asheville. Accordingly, Glen Raven had knowledge of Asheville's net operating losses prior to the date of acquisition of Asheville's outstanding stock.

After Allen Gant had been out of the room for a few moments studying the Asheville annual statements, he came back and indicated that he was interested in purchasing the business. He also mentioned a tentative purchase price of $350,000 but did not specifically indicate whether he was interested in purchasing the assets or the stock of Asheville.

Shortly after this meeting, Allen Gant and Arthur Rogers went to Asheville, N.C., made a tour of Asheville, and inspected the machines and the real estate. At this time, no further negotiations were conducted regarding the purchase price.

Subsequent to this time, a committee of four or five representatives of Glen Raven went to Asheville, N.C., and met with John T. Rodgers. At this meeting, Roger Gant, Jr., did most of the figuring. He had an attorney with him and two other men. Harold Daniel was present but did not stay in the meeting during its entirety. Jack Shuford, an attorney, was present on John T. Rodgers' behalf, but he was not familiar with what was going on.

Allen Gant was not present at these discussions in Asheville.

Roger Gant, Jr., took charge of the discussions on behalf of Glen Raven and offered John T. Rodgers substantially less for his business than the previous tentative offer made by Allen Gant. There was a great deal of discussion among the Glen Raven people and, at one time, the parties were far apart; but Roger Gant, Jr., agreed to make some concessions.

The representatives of Glen Raven finally developed a figure which was the purchase price agreed upon. John T. Rodgers did not do any figuring concerning the value of the Asheville assets but assumed that the representatives of Glen Raven knew what they were doing.

6

The parties agreed on a valuation of $291,140.65 for the assets of Asheville as of May 9, 1964. This date was used as a cutoff date for business transactions for purposes of the sale. It was agreed that the price would equal the value of assets ($291,140.65) less liabilities as of May 9, 1964, of $127,276.48. The difference of $163,864.17 was paid to John T. Rodgers on May 12, 1964. Subsequent to May 9, 1964, additional liabilities of Asheville of approximately $11,000 were discovered and John T. Rodgers paid Glen Raven for them. After this adjustment the total price paid by Glen Raven for stock of Asheville was $152,467.19.

Arthur Rogers did not take an active part in the negotiations with respect to the acquisition of the stock of Asheville.

The net book value of the stock of Asheville as of May 9, 1964, was $425,335.61.

At the time of these negotiations John T. Rodgers was advanced in years. He desired to divest himself entirely of the Asheville business and would not have been as interested in selling the Asheville assets as he was in disposing of his stock.

At the time of the sale of its outstanding stock to Glen Raven, the books, records, and financial statements of Asheville reflected its principal assets to be a building in Asheville, N.C., hosiery inventory, accounts receivable, 91 seamless hosiery machines, and 26 full-fashioned hosiery machines.

During the period January 1, 1964, through May 9, 1964, Asheville sold assets upon which it realized a profit of $62,556.46. The assets sold consisted of a parcel of land upon which a gain of $23,657.10 was realized, a parcel of land upon which a gain of $39,424.59 was realized, and a parcel of land, two dwellings, and a 1961 Cadillac upon which a loss of $525.23 was realized.

Asheville realized total capital gains from the sale of assets during the year 1964 in the amount of $65,484.31.

*Asheville's operations.*—For a number of years prior to the acquisition of its stock by Glen Raven, Asheville manufactured both full-fashioned and seamless hosiery; however, during the early 1960's Asheville's sales of full-fashioned hosiery declined following the general market trend for this product. Approximately 1 month prior to the sale of its stock, Asheville closed down its full-fashioned hosiery knitting room because this product no longer earned a profit.

Shortly after Glen Raven acquired Asheville, the full-fashioned knitting machines of Asheville were converted to the production of flat-knit fabric for use in Glen Raven's knit-de-knit operation. Some former employees of Asheville were rehired to operate the full-fashioned knitting machines. Twenty of the 26 full-fashioned knitting machines owned by Asheville were acquired between 1947 and 1953.

Although Arthur Rogers thought it would take 3 months to get the full-fashioned knitting machines of Asheville into operation and producing fabric for Glen Raven's knit-de-knit operation, it took about one-half that time.

After Asheville's full-fashioned machines were converted to the production of fabric for Glen Raven's knit-de-knit operation and the necessary help employed, the machines were operated on a 3-shift basis.

All of the fabric produced by Asheville on its full-fashioned machines during the years in issue was sold to Glen Raven which finished the knit-de-knit process at its Newland plant. The Newland plant is about 70 miles from Asheville. After the yarn was knitted into a flat-knit fabric, it was placed in a container and immediately sent to Newland.

On the first invoice rendered to Glen Raven by Asheville, the price for 140-denier antron yarn was $2.08 per pound. Invoice No. 5 was later rendered to effect a retroactive increase in the price per pound charged Glen Raven by Asheville for 140-denier yarn to $2.13 per pound. After this adjustment was made, all sales during the years 1964 and 1965 of 140-denier yarn to Glen Raven by Asheville were made at $2.13 per pound. From January 1, 1966, through February 21, 1966, the price charged by Asheville to Glen Raven for 140-denier yarn was $2.13 per pound. From February 22, 1966, through December 31, 1966, the price for 140-denier yarn charged by Asheville to Glen Raven was $2.03 per pound.

Asheville paid $1.70 per pound for the 140-denier yarn which it purchased and then knitted into flat-knit fabric and sold to Glen Raven.

The following reflects Asheville's flat-knit fabric operations from May 12, 1964, through the year 1966:

| | 1964 | 1965 | 1966 |
|---|---|---|---|
| Sales | $800,915.07 | $1,330,002.58 | $1,325,303.45 |
| Net profit | $122,359.75 | $183,154.30 | $76,905.75 |
| Pounds sold | 376,000 | 625,000 | 648,000 |
| Net profit per pound | 32.5¢ | 29.3¢ | 11.86¢ |

During the year 1965, Asheville's 26 full-fashioned machines produced an average of 12,020 pounds of fabric per week or 462 pounds per week per machine.

At the time of the sale of the Asheville stock, Asheville was still manufacturing seamless hosiery. Of the 91 seamless-hosiery knitting machines owned by Asheville at this time, 90 were single-feed and 1 was a 2-feed machine.

Prior to the time Asheville was acquired by Glen Raven, Asheville finished its hosiery in its own plant. After May 12, 1964, Asheville pro-

duced the stocking blanks on its knitting machines, closed the toes, and then inspected them. They were then shipped to Glen Raven's Newland or Altamahaw plants for the dyeing and finishing processes.

In late 1963 and early 1964, stretch hosiery was taking over the market. Stretch hosiery could not be made on single-feed, seamless-hosiery knitting machines. On the other hand, single-feed machinery was suitable for knitting patterned hosiery which was becoming popular.

Prior to Glen Raven's 1964 fiscal year, its officials had predicted that single-feed hosiery machines would be replaced by the multifeed machines which involved lower production costs. At this time, Glen Raven was not purchasing any new single-feed machines. In early 1964, Glen Raven was switching to multifeed machines, and there was more demand for this equipment than single-feed. At this time 2- and 4-feed machines were available, and these machines manufactured hosiery more economically than single-feed machines. Glen Raven first started using multifeed machines in 1956 or 1957.

Neither a normal person nor someone knowledgeable in the market can tell the difference between ladies' hosiery manufactured on single-feed knitting machines and those manufactured on multifeed machines, assuming the same type of yarn is used. Ladies' hosiery can be made substantially faster on 2-feed machines than on single-feed machines.

Asheville did not indicate on its U. S. Corporation Income Tax Returns filed for its years 1964 and 1965 that it paid any rents during those years.

During its 1963 fiscal year, Glen Raven sold 30 Scott and Williams single-feed knitting machines. During its 1965 fiscal year, Glen Raven abandoned 110 knitting machines. Of these 110 knitting machines, 61 were Buton 2-feed knitting machines and 49 were Scott and Williams single-feed knitting machines. The Buton machines were manufactured in 1954 or 1955.

I. J. Wolin was the selling agent for the seamless production of Asheville both before and after the acquisition of that company by Glen Raven.

The following schedule reflects Asheville's hosiery operations for the years 1964 through 1966:

| | 1/1/64 through 5/9/64 | 5/10/64 through 12/31/64 | 1965 | 1966 |
|---|---|---|---|---|
| Sales of seamless | $117,734.98 | $248,731.97 | $402,572.52 | $121,043.03 |
| Net loss on all hosiery | (105,039.63) | | | |
| Net profit on seamless | | 27,630.33 | 41,528.50 | 3,385.17 |
| Sales to Glen Raven | | 39,333.33 | 74,957.30 | 61,440.60 |

Asheville's total sales of hosiery for the year 1964 were $440,867.67.

During the year 1964, Asheville sustained a net loss of $77,409.30 on all its hosiery operations.

Asheville's total inventory at the beginning of the year 1966 was $131,092.83.

On January 31, 1966, Asheville sold hosiery in the amount of $60,617 to Glen Raven. During the month of February 1966, Glen Raven shipped hosiery in the amount of $16,716 on behalf of Asheville and billed Asheville for these sales. During the month of March 1966, Glen Raven shipped $14,625.14 worth of hosiery on behalf of Asheville, and these shipments were billed to Asheville. A profit of $4,716.58 was realized by Asheville on the sales for the months of February and March based upon shipments made on its behalf by Glen Raven.

During the period April 9 to April 29, Glen Raven shipped total hosiery of $13,079.93 on behalf of Asheville and charged Asheville $12,997.23 for these shipments, resulting in a profit of $82.70.

At the time of the acquisition, Asheville was manufacturing seamless hosiery. In late 1965 preparations were being made to move double-knit machines into the Asheville plant. These machines were to be moved into the Asheville plant by Asheville Knitting Mills, another wholly owned subsidiary of Glen Raven which operated in the physical plant of Asheville. In order to make room for these double-knit machines and to allow the plant to be expanded for these new machines, Asheville's seamless-hosiery knitting machines were moved to Newland and were no longer operated by Asheville by the end of 1965. At the time that the machines were moved to Newland, the plant expansion was undertaken at Asheville. The first double-knit machines were moved into the Asheville plant by Asheville Knitting Mills in the latter part of 1965.

As of December 31, 1965, Asheville had construction in progress amounting to $7,030.99.

After Asheville ceased operating the seamless-hosiery knitting machines at the end of 1965, some of the employees previously employed to operate them did not remain as employees of Asheville.

After Asheville discontinued manufacturing seamless hosiery, the only manufacturing that was conducted by that company was the knitting of yarn into a flat fabric. During the year 1966, the product manufactured by Asheville was flat-knit fabric.

When material comes off a full-fashioned knitting machine producing hosiery, it is white and is shaped as if a lady's hose were split and ironed out flat. The material is narrow at one end and wide at the other end, and at the wide end the material is different in that it is much heavier. All the flat-knit material produced on Asheville's full-

fashioned machines after Glen Raven's acquisition on May 12, 1964, was the same width and texture.

Asheville sustained net operating losses of $25,882.34, $62,957.60, and $204,101.55 for the years 1959, 1962, and 1963, respectively.

Asheville's net income for the years 1964 and 1965 was $114,879.18 and $221,909.07, respectively.

On its returns for the years 1964 and 1965, Asheville claimed net operating loss carry-forward deductions of $114,879.18 and $178,-062.31, respectively.

As a result of such deductions, Asheville reported no taxable income for the year 1964 and only $43,846.76 of taxable income for the year 1965.

### OPINION

For 1964 and 1965 respondent disallowed net operating loss carry-forward deductions of Asheville which were attributable to losses incurred in years prior to the acquisition of its stock by Glen Raven. We shall summarize the history of this acquisition.

In early 1964 Glen Raven sought ways to increase its supply of knitted fabric used in the production of crimped or knit-de-knit yarn. This yarn was a very profitable product for Glen Raven, and it was backordered. In April 1964, Glen Raven entered into negotiations for the purchase of Asheville from its principal shareholder, John T. Rodgers. Asheville at that time was in serious financial distress; it had suffered net operating losses in several prior years and had just discontinued making one of its product lines, full-fashioned hosiery. John T. Rodgers wished to disengage himself entirely from the business.

The management of Glen Raven and John T. Rodgers agreed upon a valuation for the assets of Asheville of $291,140.65. The net book value of its stock was $425,335.61.

On May 12, 1964, Glen Raven purchased the stock of Asheville from John T. Rodgers. After later adjustments Glen Raven paid $152,467.19 which represented the difference between the value of the assets ($291,-140.65) and the liabilities of Asheville ($138,673.46).

In considering the purchase of the Asheville stock the management of Glen Raven knew that Asheville had had substantial net operating losses in prior years. After acquiring the Asheville stock, Glen Raven quickly made changes on Asheville's 26 full-fashioned knitting machines, which had formerly made hosiery, which enabled the machines to knit flat fabric for Glen Raven's knit-de-knit operations. Asheville continued to make hosiery on its 91 single-feed, seamless-hosiery knitting machines after the purchase.

Glen Raven operated Asheville as a subsidiary from May 12, 1964, until December 31, 1966, when it was merged into its parent. During

the period that Asheville was a subsidiary the full-fashioned knitting machines were operated on a 3-shift basis producing fabric for Glen Raven's knit-de-knit operation. This fabric was all sold to Glen Raven at a substantial profit which would be completely or mostly offset during the years in issue if net operating losses generated prior to May 12, 1964, were allowable.

In late 1965, Asheville discontinued manufacture of seamless hosiery. Its single-feed, seamless-hosiery knitting equipment was moved to another plant of Glen Raven, and its plant was enlarged to accommodate machinery for making double-knit fabric which was then brought in.

Respondent advances two theories to support his determination that Asheville was not entitled to utilize in 1964 and 1965 operating losses sustained by it prior to its acquisition by Glen Raven: (1) That after its acquisition by Glen Raven, Asheville did not carry on substantially the same business as it did prior to the acquisition; and (2) that the principal purpose for Glen Raven's acquisition of Asheville was to avoid Federal income taxes. Respondent's first argument brings section 382(a)(1) into play while his second uses section 269(a)(1).

Section 382(a)(1)[2] provides an objective test for disallowance of net operating loss carry-forwards attributable to preacquisition losses where control of a corporation is acquired by another corporation. This test is applied at the close of the taxable year of the acquisition and of the subsequent taxable year. There is no dispute between the parties or upon the record that Glen Raven acquired the requisite control of Asheville for purposes of section 382(a) when it purchased the Asheville stock from John T. Rodgers. The only issue existing under

---

[2] SEC. 382. SPECIAL LIMITATIONS ON NET OPERATING LOSS CARRYOVERS.
  (a) PURCHASE OF A CORPORATION AND CHANGE IN ITS TRADE OR BUSINESS.—
    (1) IN GENERAL.—If, at the end of a taxable year of a corporation—
      (A) any one or more of those persons described in paragraph (2) own a percentage of the total fair market value of the outstanding stock of such corporation which is at least 50 percentage points more than such person or persons owned at—
        (i) the beginning of such taxable year, or
        (ii) the beginning of the prior taxable year,
      (B) the increase in percentage points at the end of such taxable year is attributable to—
        (i) a purchase by such person or persons of such stock, the stock of another corporation owning stock in such corporation, or an interest in a partnership or trust owning stock in such corporation, or
        (ii) a decrease in the amount of such stock outstanding or the amount of stock outstanding of another corporation owning stock in such corporation, except a decrease resulting from a redemption to pay death taxes to which section 303 applies, and
      (C) such corporation has not continued to carry on a trade or business substantially the same as that conducted before any change in the percentage ownership of the fair market value of such stock,
    the net operating loss carryovers, if any, from prior taxable years of such corporation to such taxable year and subsequent taxable years shall not be included in the net operating loss deduction for such taxable year and subsequent taxable years.

section 382(a) is whether Asheville conducted the same trade or business after the acquisition as it did before.

Respondent contends that at the time of Glen Raven's purchase of the Asheville stock Asheville's only business was the manufacture of seamless hosiery. Although this business was continued in somewhat modified form for over a year after the Glen Raven takeover, respondent takes the position that Asheville began an entirely new business, the manufacture of fabric for Glen Raven's knit-de-knit operations, immediately after the acquisition. Additionally, respondent points out that by the end of 1965 Asheville knit no hosiery at all and that all of the seamless-hosiery knitting equipment had been moved out in order to install machines for knitting double-knit fabric. Accordingly, in respondent's view Asheville had completely discontinued its pre-acquisition hosiery business to engage in the manufacture of flat fabric by the end of 1965.

Petitioner claims that respondent's view of Asheville's business is too narrow and that at all relevant times Asheville was engaged in the business of knitting yarn into fabric. Petitioner relies upon the facts that both before and after the acquisition Asheville for the most part used the same machinery and many of the same employees to manufacture knitted products and that it was not until 1966 that Asheville began using its new double-knit equipment. Petitioner urges that we disregard Asheville's discontinuance of use of its full-fashioned equipment for the month prior to the acquisition because the period of disuse was too short to be significant.

Both parties attempt to support their positions by use of section 1.382(a)-1(h)(5) of the regulations which enumerates six specific factors to be considered along with any other relevant item in determining whether a corporation has changed its business. The regulation looks to changes in the corporation's employees, plant, equipment, location, product, and customers. From the record it appears that Asheville used many of the same employees after the Glen Raven takeover as before and that at least until the end of 1965 it operated most of the same equipment that it used before the takeover. Accordingly, the only areas in which there were significant changes in Asheville's operation were in its product and customers.

Section 382(a) does not require that a corporation pursue exactly the same business after an acquisition as it pursued before but only substantially the same business. Therefore, a degree of flexibility is built into the statute. *Goodwyn Crockery Co.*, 37 T.C. 355 (1961), affd. 315 F. 2d 110 (C.A. 6, 1963). In this case Asheville's existing equipment was quickly converted from making full-fashioned hosiery to making flat fabric. Although respondent makes an issue of the fact that flat fabric and hosiery look quite different to an average indi-

vidual, we believe that to a person in the knitting business they are quite similar. The fact that the two products could be made on the same machine indicates that there was an intrinsic similarity between them. We note also that Asheville continued to make seamless hosiery until the end of 1965 in quantities which were greater than existed before the acquisition. This hosiery was largely sold through the same broker as before the Glen Raven takeover.

Respondent contends that prior to the takeover Asheville did not sell to Glen Raven and that afterwards it sold all of its flat fabric made on the full-fashioned machines to Glen Raven. While this fact may indicate that Asheville had a change of customers, respondent has not pointed out how this change significantly altered Asheville's business. The change in Asheville's customers as well as the other changes in Asheville's operations are in our opinion no more substantial than those which we approved in *Goodwyn Crockery Co.*, *supra*, where the corporation shifted its office location, added a new line of products, and began selling in part at retail rather than solely at wholesale after a takeover by another corporation. Both before and after the acquisition, Asheville's operations could best be described as a building and a number of machines for knitting hosiery and fabric; we do not think that any of the changes made by Glen Raven substantially altered this picture. Accordingly, we hold that section 382(a)(1) does not deny Asheville the use of preacquisition net operating losses.

As an alternative to his argument under section 382 respondent contends that the preacquisition losses were not usable by Asheville under section 269(a)(1) which provides the following:

(a) IN GENERAL.—if—

(1) any person or persons acquire, or acquired on or after October 8, 1940, directly or indirectly, control of a corporation * * *

*    *    *    *    *    *    *

and the principal purpose for which such acquisition was made is evasion or avoidance of Federal income tax by securing the benefit of a deduction, credit, or other allowance which such person or corporation would not otherwise enjoy, then the Secretary or his delegate may disallow such deduction, credit, or other allowance. For purposes of paragraphs (1) and (2), control means the ownership of stock possessing at least 50 percent of the total combined voting power of all classes of stock entitled to vote or at least 50 percent of the total value of shares of all classes of stock of the corporation.

The parties are in agreement that Glen Raven acquired the requisite control of Asheville for purposes of section 269 through the purchase of its stock; nor does there appear to be any dispute that section 269 can be used to disallow the net operating loss carry-forwards of an acquired corporation like Asheville. See *Coastal Oil Storage Co.* v. *Commissioner*, 242 F. 2d 396 (C.A. 4, 1957); *James Realty Co.* v.

*United States*, 280 F. 2d 394 (C.A. 8, 1960). The only question existing under section 269 is a factual one: Whether Glen Raven's principal purpose in acquiring the stock of Asheville was avoidance of Federal income tax. Unlike the test of section 382(a), which can be judged by objective facts, section 269(a) requires that we make a subjective evaluation of Glen Raven's motives.

Glen Raven claims that its principal motivation for buying the stock of Asheville was to obtain a supply of fabric for its knit-de-knit operation which was its most profitable product line and which was severely backordered in the spring of 1964. Respondent contends on the other hand that Glen Raven had an adequate knit-de-knit inventory, that it could have obtained additional sources of fabric, if needed, without purchasing the Asheville stock, and that in view of these two facts its acquisition of Asheville can best be explained by a desire to use Asheville's prior period operating losses.

Respondent relies upon the stipulated fact that as of the end of April 1964 Glen Raven had an inventory (valued at lower of cost or market) of knit-de-knit yarn of about $600,000, which was equal to about 10 percent of GlenRaven's yearly sales of the product, to support his contention that Glen Raven did not need additional supplies of fabric at the time that it acquired Asheville. We believe that petitioner is correct in pointing out that the inventory figure merely indicates Glen Raven's stock of supplies for its knit-de-knit operation in all stages of production and does not indicate how much finished knit-de-knit yarn Glen Raven had on hand. According to evidence presented by petitioner Glen Raven was backordered by about 700,000 pounds of finished yarn in April 1964. We also believe that the bottleneck in Glen Raven's production of finished yarn was an inadequate supply of fabric.

Respondent claims that the purchase of Asheville was one of several viable alternatives available to Glen Raven for obtaining fabric. We do not think that the record supports respondent's view of the alternatives available to Glen Raven.

Respondent contends that Glen Raven could have obtained additional new Scott and Williams 10-head knitting machines and used full-fashioned machines for use in its own expanding plant facilities. We note first that Glen Raven continued to purchase new Scott and Williams machines throughout the period involved here. These machines cost about 8 times as much initially as used full-fashioned machines which did not produce appreciably less fabric. Purchasing used full-fashioned machinery was not always practical because this bulky machinery was difficult and costly to move from one place to another. Accordingly, it was expensive for Glen Raven to purchase additional new machinery and difficult for it to put used machinery into operation

in its own plants. It is apparent that the purchase of Asheville avoided the problems of purchasing machinery because it permitted Glen Raven to use inexpensive used machines without bearing the cost of moving them. Additionally, the Asheville machines could be made ready within a short time for Glen Raven's purposes.

Even though respondent cannot deny that Asheville's plant and machinery had special advantages from Glen Raven's point of view, he contends that Glen Raven could have acquired Asheville's assets as easily as its stock. This contention is also not supported by the record. When asked at trial whether he would have sold the Asheville assets rather than his stock if he could have received the same amount of money, John T. Rodgers answered equivocally. In his other testimony he indicated that in early 1964 he was old, that his associates were in failing health, and that he desired to get rid of his interest in Asheville. These facts support petitioner's witnesses who indicated that Rodgers wanted to dissociate himself entirely from Asheville by selling his stock.

Respondent has mainly asked this Court to speculate about what Glen Raven might have done if it desired to avoid acquiring Asheville. This speculation has not been overly helpful in determining what Glen Raven's purpose was in doing what it actually did.[3] On the record we believe that Glen Raven needed a new source of knitted fabric for its knit-de-knit operations in early 1964 and that the acquisition of Asheville was a response to that need. Although Glen Raven knew before the purchase of the possible tax benefits flowing from Asheville's prior period operating losses, we believe that business necessity rather than tax avoidance was the principal purpose for its purchase of the Asheville stock and that section 269(a) should not apply. See *Baton Rouge Supply Co.*, 36 T.C. 1 (1961).

In order to bolster his case against Glen Raven, respondent argues that section 269(c) requires that his determination be sustained. This provision states the following:

(c) PRESUMPTION IN CASE OF DISPROPORTIONATE PURCHASE PRICE.—The fact that the consideration paid upon an acquisition by any person or corporation described in subsection (a) is substantially disproportionate to the aggregate—

[3] Respondent also requested that we find several facts which tended to show that Glen Raven was a tax-conscious corporation and that it operated Asheville in such a way that it made large profits while there were net operating loss carry-forwards to be used and smaller profits when there were no carry-forwards. We have not found these facts and draw no conclusion from them. The transactions which respondent claims show Glen Raven's tax consciousness shed no light upon the transaction under consideration in this case. Under respondent's theory of relevancy petitioner could be made to show excuses in this case for any unrelated transaction in which Glen Raven obtained a tax benefit. Petitioner's burden is not that great. Evidence of the manner in which Glen Raven operated Asheville as a subsidiary after the acquisition might have been relevant if respondent had made an allocation under sec. 482 in his notice of deficiency; however, we fail to see the relevancy of this evidence under sec. 269 where the question is Glen Raven's purpose at the time of the acquisition.

(1) of the adjusted basis of the property of the corporation (to the extent attributable to the interest acquired specified in paragraph (1) of subsection (a)), or of the property acquired specified in paragraph (2) of subsection (a); and

(2) of the tax benefits (to the extent not reflected in the adjusted basis of the property) not available to such person or corporation otherwise than as a result of such acquisition,

shall be prima facie evidence of the principal purpose of evasion or avoidance of the Federal income tax. This subsection shall apply only with respect to acquisitions after March 1, 1954.

Because it is clear that Glen Raven paid substantially less for the stock of Asheville than the sum of the basis of Asheville's assets and the tax benefits derived from the acquisition, respondent contends that section 269(c) applies in this case.[4] We have noted previously that the relationship between the test of section 269(c) and tax-avoidance motives is far from clear and that the provision is merely a "procedural device" which adds further weight to the presumption of correctness already existing in the Commissioner's determination. *H. F. Ramsey Co.*, 43 T.C. 500 (1965). In this case Glen Raven proved that it principally acquired Asheville for a valid business reason. We believe this proof meets any burden placed upon petitioner by section 269(c).

Accordingly, we hold that section 269 does not deny Asheville the benefit of deductions for net operating losses incurred prior to its acquisition by Glen Raven.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

---

DAWSON, *J.*, concurring: I agree with the result reached in the majority opinion. In the first place, I think the majority's application

---

[4] The sum of the basis of Asheville's assets and the tax benefits is $718,277.10 as shown below:

| | | |
|---|---:|---:|
| Basis of Asheville assets | | $425,335.61 |
| Net operating loss 1959 | $25,882.34 | |
| Net operating loss 1962 | 62,957.60 | |
| Net operating loss 1963 | 204,101.55 | |
| Total tax benefits | | 292,941.49 |
| Total | | 718,277.10 |

Alternatively, assuming that the tax benefits referred to in sec. 269 are actual taxes saved, the sum is $561,245.11 as shown below:

| | | |
|---|---:|---:|
| Basis of Asheville assets | | $425,335.61 |
| Tax saved in 1964 | $50,439.59 | |
| Tax saved in 1965 | 85,469.91 | |
| Total tax benefits | | 135,909.50 |
| Total | | 561,245.11 |

of the factors suggested by section 1.382(a)–1(h)(5) of the regulations is correct. Secondly, I think the result reached is consistent with the line of liberal opinions by this Court. See *Goodwyn Crockery Co.*, 37 T.C. 355, 362 (1961), affd. 315 F.2d 110 (C.A. 6, 1963) ("Under the wording of the section it would seem there could be some changes in the manner of conducting that trade or business and yet the business could remain 'substantially the same.' "); *H. F. Ramsey Co.*, 43 T.C. 500, 514 (1965) ("it would appear that there has to be a real change in the type of business conducted to come within this statute."); *Clarksdale Rubber Co.*, 45 T.C. 234 (1965), which closely follows the above two cases; *Wallace Corp.*, T.C. Memo. 1964–10, which distinguishes a long line of egregious cases. See also *Kolker Bros., Inc.*, 35 T.C. 299, 304–305 (1960) (decided under sec. 122, I.R.C. 1939); *Koppers Co.* v. *United States*, 229 F. Supp 159, 165 (W.D. Pa. 1964) ("Neither the Code, the Regulations, nor the decisions give the slightest support to the proposition that the business must be carried on in substantially the same manner. The question is whether it is substantially the same business."). Unlike the dissenters, I would place this case within the precedential orbit of *Goodwyn Crockery*, far away from cases such as *Euclid-Tennessee, Inc.*, 41 T.C. 752 (1964), affd. 352 F.2d 991 (C.A. 6, 1965) (change from the brewery business to the leasing of property to the heavy equipment business; the *"basic character"* of the business had changed), and *J. G. Dudley Co.*, 36 T.C. 1122 (1961), affd. 298 F.2d 750 (C.A. 4, 1962) (change from business of hosiery manufacturing to the business of electrical heating, plumbing, and contracting; decided under sec. 122, I.R.C. 1939, following *Libson Shops, Inc.*).

Finally, I think Congress intended for us to strike a balance between two oft-conflicting goals; one, the curtailment of trafficking in loss corporations and, two, the avoidance of any dampening effects on valid business transactions. Here the majority has found no "trafficking." I would also emphasize the potential "dampening effects." Because of the high degree of competition and the need for product diversification in the textile business, the key to success seems to be flexibility. The rather narrow, restrictive view expressed in the dissenting opinion would tie the hands of businessmen in this and similar businesses for as much as 2 years. That, in my judgment, would make section 382(a) the instrument of uneven justice. See and compare *Coast Quality Construction Corp.* v. *United States*, 463 F. 2d 503 (C.A. 5, 1972), a recent opinion which takes a practical and sound approach.

DRENNEN, STERRETT, and GOFFE, *JJ.*, agree with this concurring opinion.

STERRETT, *J.*, concurring: In permitting a deduction for a net operating loss carryover, Congress must have contemplated the existence of some income against which to offset the loss. This being so, surely Congress must have assumed that the new owners would make some changes in the operations to convert a losing operation into a profitable one. It would seem to follow then that the phrase "continued to carry on a trade or business *substantially* the same" (emphasis supplied) in section 382(a) (1) (C) must be interpreted in a manner to permit some modifications in the losing operation.

It is clear to me that despite some changes in Asheville's operations it remained in the hosiery business through the end of 1965. Although Asheville may have stopped manufacturing hosiery in 1965, it sold hosiery through the end of 1965 and into 1966. More importantly, some of the flat fabric manufactured on the full-fashioned machines and sold to Glen Raven was eventually crimped, unraveled, and knit into hosiery by Glen Raven. Accordingly, Asheville merely changed from a complete manufacturer of hosiery to a component maker in Glen Raven's integrated hosiery manufacturing operation. Through the end of 1965 Asheville continued to sell hosiery and to manufacture some cloth which was turned into hosiery. It would be hard to conclude that Asheville did not remain in substantially the same business within the intendment of Congress.

TANNENWALD, FAY, and GOFFE, *JJ.*, agree with this concurring opinion.

---

SIMPSON, *J.*, dissenting: I must dissent with respect to the Court's holding that section 382(a) is not applicable in this case.

Since at least 1944, Congress has been concerned with the trafficking in corporations with operating loss carryovers. See H. Rept. No. 871, 78th Cong., 1st Sess., 1944 C.B. 901, 938. In that year, Congress enacted the predecessor of section 269, which provided that if the primary intent or purpose of the acquisition was the evasion of taxes, the benefit of the carryovers would be denied to the successor corporation. By 1954, Congress had concluded that the intent or purpose test had "proved ineffectual" and that a test based on objective factors was needed. H. Rept. No. 1337, 83d Cong., 2d Sess., p. 41 (1954) ; see S. Rept. No. 1622, 83d Cong., 2d Sess., p. 53 (1954). The House passed a bill which provided that whenever there was a substantial change in the ownership of a corporation, the successor corporation would be denied the benefits of the carryovers. See H. Rept. No. 1337, *supra* at pp. A142–A144. The Senate believed that the House bill was too stringent and concluded that the benefits of the carryovers should not be denied if the successor corporation continued to carry on sub-

stantially the same business as had the corporation before the acquisition. See S. Rept. No. 1622, *supra* at pp. 284–285.

In considering this case, there may be a tendency to lose sight of the true issue. We are not concerned with what changes may be made by the owners of a corporation to make the business profitable, or whether to adopt rules that encourage or discourage such changes. We are concerned solely with the question of whether investors may purchase the stock of a corporation and reduce or eliminate the tax on the income that they derive from the corporation by reason of the loss generated by the business prior to their acquisition. The purpose of net operating loss carryovers is "to ease the tax burden imposed by annual tax accounting rules on a business which encounters fluctuations extending beyond the accounting period." *Coast Quality Construction Corp.* v. *United States*, 463 F. 2d 503 (C.A. 5, 1972). By the enactment of section 382(a), Congress laid down the rule that the new owners are not to be allowed to use such carryovers unless they carry on substantially the same business.

The applicability of section 382(a) turns on the legal question of what test is to be utilized in determining whether a corporation continues to carry on substantially the same business. *Coast Quality Construction Corp.* v. *United States, supra*. Clearly, the statute does not require the new owners to continue exactly the same business; some changes may be made. For example, the new owners may make some changes in the personnel, and products may be changed from year to year to accommodate to changes in design. However, the Senate committee report stated that a corporation is not carrying on substantially the same business "If * * * the corporation shifts from one type of business to another, discontinues any except a minor portion of its business, changes its location, or otherwise fails to carry on substantially the same trade or business." S. Rept. No. 1622, *supra* at p. 285. To be substantially the same, it seems to me as though the permitted changes can be only minor or insubstantial; in other words, to be substantially the same, the new business must in most respects constitute the same business operations. See *Coast Quality Construction Corp.* v. *United States, supra*. The statute requires that the business operations before the acquisition be compared with the business operations at the end of the year of the acquisition and at the end of the succeeding year. There is no indication in the statute or the legislative history that when Congress required merely that the business be substantially the same, it contemplated unlimited or extensive changes necessary to eliminate unprofitable operations.

Before the acquisition, Asheville was in the business of manufacturing full-fashioned and seamless hosiery for sale to the public. After

the acquisition, its 26 machines, which had been used for the manufacture of full-fashioned hosiery, were converted to the production of the flat fabric which was sold to Glen Raven. During 1964 and most of 1965, Asheville continued to manufacture seamless hosiery. However, according to the findings of the majority:

In order to make room for * * * [the new machines to manufacture additional knit-de-knit fabric for Glen Raven] and to allow the plant to be expanded for these new machines, Asheville's seamless hosiery knitting machines were moved to Newland and were no longer operated by Asheville by the end of 1965. * * *

After Asheville discontinued manufacturing seamless hosiery, the only manufacturing that was conducted by that company was the knitting of yarn into a flat fabric. * * *

* * * [Fabric manufactured for hosiery] is white and is shaped as if a lady's hose were split and ironed out flat. The material is narrow at one end and wide at the other end, and at the wide end the material is different in that it is much heavier. All the flat knit material produced on Asheville's full-fashioned machines after Glen Raven's acquisition on May 12, 1964, was the same width and texture.

By the end of 1965, Asheville was no longer manufacturing hosiery or fabric for hosiery. At that time, the plant of Asheville, some of its equipment, and some of its employees were still being used, but they were being used to supplement the production of knit-de-knit flat fabric for Glen Raven. The product lines had been completely changed, and the customers were completely different. Although some of the flat fabric which Glen Raven acquired from Asheville was used to make yarn for the manufacture of hosiery, it was Glen Raven that converted the fabric into such use. Moreover, since Glen Raven has the burden of proving that section 382(a) is not applicable, and since we have no evidence as to the amount of the fabric so converted, that use of the fabric does not support Glen Raven's position. When Asheville's operations at the end of 1965 are compared with its operations before the acquisition, it seems clear to me that it was no longer conducting the same business or substantially the same business. Although Asheville was still engaged in the textile industry, the applicability of section 382(a) does not turn on whether the corporation remains in the same industry.

In *Goodwyn Crockery Co.*, 37 T.C. 355 (1961), the corporation, before its acquisition, was engaged in the selling of housewares at wholesale; after the acquisition, a new business was added—selling dry goods at retail. This Court held that section 382(a) was not applicable because under the new ownership, the corporation continued to carry on the business of selling housewares at wholesale, with only minor changes in the customers and the place of doing business. Our decision was affirmed by the Sixth Circuit, although that court expressly indicated that it might not have reached the same conclusion if it had been deciding the matter initially. *Commissioner* v. *Goodwyn Crockery Co.*,

315 F. 2d 110 (C.A. 6, 1963). Our opinion stands for the proposition that the addition of a new business will not cause section 382(a) to be applicable, if the former business is also carried on with only minor changes. *Euclid-Tennessee, Inc.*, 41 T.C. 752 (1964), affd. 352 F. 2d 991 (C.A. 6, 1965), certiorari denied 384 U.S. 940 (1966). Bittker & Eustice consider that *Goodwyn Crockery* represents the probable outer limit of the changes that can be made without causing section 382(a) to become applicable. Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders, par. 16–22, pp. 16–50 (3d ed. 1971). Nevertheless, the Court's holding in this case goes significantly beyond *Goodwyn Crockery*. Here, Asheville no longer carried on the business of manufacturing hosiery at the end of 1965. That business had been replaced entirely by the business of manufacturing flat fabrics to be sold to Glen Raven.

RAUM and QUEALY, *JJ.*, agree with this dissent.