FAIRFIELD COMMUNITIES LAND COMPANY AND AFFILIATED SUBSIDIARIES v. COMMISSIONER OF INTERNAL REVENUE
Fairfield Communities Land Co. v. Commissioner
Docket No. 6164-78.
United States Tax Court
T.C. Memo 1984-100; 1984 Tax Ct. Memo LEXIS 571; 47 T.C.M. (CCH) 1194; T.C.M. (RIA) 84100; March 1, 1984. *571 Fairfield, a land development company, with few stockholders, sought to acquire the assets and liabilities of Oceans, an unrelated company that was in liquidation. Oceans had cash in the amount of about $575,000, few known liabilities, and its stock was publicly traded. It had a net operating loss carryover of $1,645,767; Fairfield had net operating loss carryovers of in excess of 2 million dollars. In June 1971 an agreement was reached whereunder Greers Ferry, a wholly owned subsidiary of Fairfield with little or no income and few assets, acquired all the assets and liabilities of Oceans in exchange for Fairfield stock, which would be distributed to the Oceans stockholders on liquidation of that company. The cash received by Greers Ferry from Oceans was transferred to Fairfield. Greers Ferry later merged with a profitable company and Fairfield changed its tax accounting method to reflect taxable net income. The net operating losses of Oceans were claimed as deductions on the consolidated returns filed by Fairfield and its subsidiaries for its fiscal years ending February 28, 1974 and 1975, and February 29, 1976.
Held: Respondent erred in disallowing the net operating loss carryover *572 deductions claimed by petitioner. Petitioner carried its burden of proving that its principal purpose in acquiring the assets and liabilities of Oceans was not to evade or avoid Federal income taxes within the meaning of Section 269, I.R.C. 1954. Alston Jennings,Terry L. Mathews, and Elizabeth Blaich, for the petitioner. Deborah A. Butler, for the respondent. DRENNEN
MEMORANDUM FINDINGS OF FACT AND OPINION DRENNEN, Judge: Respondent determined deficiencies in petitioner's consolidated income taxes for the fiscal years ending February 28, 1974 and 1975, and February 29, 1976 in the amounts of $458,878, $218,846, and $3,297, respectively. The sole issue for decision is whether petitioners are precluded by section 269, I.R.C. 1954, [1] from deducting the net operating losses of Oceans General, Inc. (hereinafter "Oceans"), incurred prior to the date, June 9, 1971, that Oceans transferred all of its assets and liabilities to Greers Ferry Insurance Agency, Inc. (hereafter "Greers Ferry"), a wholly owned subsidiary of Fairfield Communities Land Company (hereinafter "Fairfield") in exchange for stock of Fairfield in a non-taxable transaction under section 368(a)(1)(C). This in turn depends *573 on whether Fairfield indirectly acquired the property of Oceans for the principal purpose of evading or avoiding Federal income taxes by acquiring the net operating loss carryover attributable to Oceans. FINDINGS OF FACT Fairfield was organized in January, 1966, as an Arkansas corporation named Fairfield Bay, Inc., and was reorganized as a Delaware corporation in January, 1970 under its present name. Its principal office at the time the petition herein was filed was in Little Rock, Arkansas. It is primarily engaged, directly and through subsidiaries, in acquiring large tracts of unimproved real estate and developing these tracts into recreational and retirement communities from which lots, houses, mobile homes and related improvements are sold. Greers Ferry was organized in Arkansas in March, 1970, primarily to insure various aspects of Fairfield's operations. Its name was changed several times prior to 1971 when its name was Greers Ferry, Inc., a Delaware corporation. It is a wholly owned subsidiary of Fairfield. Its net income for the year ended February 28, 1971, was *574 stated to be zero. Fairfield's first development was in Fairfield Bay, Arkansas, consisting of approximately 5,500 acres. In January 1970, Fairfield acquired a large parcel of land in Tennessee which it developed into a community known as Fairfield Glade. Fairfield's sales promotion program has been based primarily upon the use of direct mail to invite prospective lot purchasers to visit its facilities. Fairfield also utilized an "off-site" sales program which included visits to customers who had previously purchased lots to sell such persons homes or homesite improvement packages. Fairfield's on-site sales program was seasonal in nature, beginning approximately in April and ending in the middle of October. Fairfield sold most of its properties on the installment basis, receiving relatively small amounts as down payments. It was a volume producer. Due to this factor, coupled with its large up front development and sales program expenditures, Fairfield was constantly in a squeeze for cash. For financial purposes, Fairfield used the accrual method of accounting. Sales of lots and homesite improvement packages were recognized and included in income in the accounting period in *575 which the down payment was received. For Federal income tax purposes, Fairfield reported its income using the installment sales method, under which only a small portion of the sales price was recognized when the sale was consummated. The use of the accrual method of accounting for financial purposes, under which the entire sales price was included in income at the time of the sale, resulted in Fairfield showing a profit for financial purposes; the accrued income exceeded costs. But for income tax purposes, Fairfield reported rather large operating losses during the earlier years of its operations. On its tax returns for the taxable years ended February 28, 1967, 1968, 1969, 1970 and 1971, as adjusted, Fairfield claimed net operating losses in the amounts of $110,200, $157,950, $334,500, $202,947 and $1,795,556, respectively. As of February 28, 1971, Fairfield had net operating loss carryovers in excess of two million dollars. Fairfield reported gross sales of $6,079,364 on its tax returns for the year ending February 28, 1971. Initially, Fairfield alleviated its cash deficits by borrowing, selling common stock in private placements and other financing transactions. In November *576 1969, Walter E. Heller and Company of Louisiana, Inc. (Heller) agreed to lend fairfield up to $2,000,000 on a revolving credit basis. The credit bore interest at rates of 15%-16%, was secured by mortgages and contracts receivables, and was subject to various limitations related to the loan value of installment sales contracts. In December 1969 Fairfield raised $500,000 by issuing 80,000 shares of common stock to Lombard, Vitalis, Paccanucci and Nelson, Inc., an investment firm, in a private sale. In January 1970 Fairfield acquired the land in Tennessee known as Fairfield Glade. In order to develop this land, Fairfield required additional cash. Since its contract receivables were rather "green," their values for borrowing purposes were not substantial. Heller refused to increase its line of credit unless Fairfield could match the increase with additional equity capital. In January 1970 Fairfield filed a registration statement with the Securities and Exchange Commission proposing to issue additional stock for an aggregate offering price of $4,500,000. A few weeks subsequent to the filing an article appeared in Barron's magazine criticizing the accounting method used by land development *577 companies, including Fairfield, resulting in a weakening of the market for this type of security. Fairfield's underwriters informed Fairfield that the proposed public offering could not be sold. On July 7, 1970, Fairfield withdrew the registration statement. This left it in a rather critical cash position to complete its selling program for the summer of 1970 and to prepare for its selling season for 1971. In August and October 1970, Fairfield raised $525,000 by selling common stock in a private placement to a limited group of the 1969 private placement investors. Heller thereupon extended its line of credit to $2,500,000. This enabled Fairfield to cover expenses already incurred for the 1970 selling season, but additional cash was needed for the 1971 selling season. Fairfield began a search to raise additional cash for the 1971 selling season without which it would have to curtail its planned business activities In September 1970, John Rex, Vice-President of Finance for Fairfield, responded to several ads in the Wall Street Journal and let it be known that Fairfield was interested in negotiating with a company that had cash, no liabilities, and a large number of public shareholders.He *578 came in contact with Joseph Bianco, Vice-President of Marantette & Co. of Detroit, which was representing Oceans, a financially unsuccessful company which nevertheless had about $600,000 in cash. Bianco's objective was to put Oceans' stockholders into a promising corporation through a sale or merger to avoid having to liquidate Oceans, which would require the stockholders of Oceans to liquidate their investments and realize losses at that time. Oceans also had a relatively large number of stockholders and a net operating loss carryover of about $1,600,000. On November 15, 1970, George Jacobus, President of Fairfield, and C. Randolph Warner, Secretary and General Counsel of Fairfield, met with J. A. Mullen, Chairman of Oceans and Alfred Moses, an attorney in Washington representing Oceans, to conduct negotiations. After this meeting Warner recommended that Fairfield acquire Oceans or its assets and liabilities, primarily because of Oceans' cash and, secondarily, to have the numerous Oceans stockholders become stockholders of Fairfield so that Fairfield would automatically become a publicly held corporation. Warner also recognized that Oceans' operating loss carryover was an intangible *579 asset having some value but he discounted that value to Fairfield because Fairfield had a larger operating loss carryover of its own. Warner also believed that under the tax laws (section 382), since the Oceans stockholders would receive less than 20 percent of the stock of Fairfield, Fairfield would be entitled to utilize at best only 25-30 percent of Oceans' loss carryovers, if any at all. An agreement was reached whereby Fairfield was to acquire all of Oceans' assets and assume its liabilities in exchange for Fairfield stock. However, counsel for Oceans objected to a provision that Fairfield's assumption of Oceans' liabilities would be limited to known and recorded liabilities which would not include unknown warranty liabilities. He insisted that Oceans stockholders be relieved of all liabilities, known and unknown. Because Fairfield did not want to assume unknown liabilities that might arise from warranties issued by subsidiaries of Oceans upon the sale of boats that they manufactured, an alternative method of acquisition was sought. It was decided that Greers Ferry, a wholly owned subsidiary of Fairfield which had little net income and very few assets, would acquire Oceans' *580 assets and liabilities in exchange for Fairfield stock. A contract carrying out the alternative plan was agreed upon by all three corporations. As a result of negotiations, including the value of Fairfield's stock, it was agreed that slightly less than 80,000 shares of Fairfield stock would be transferred to Oceans in exchange for its assets, such stock being approximately equal in value to Oceans' net assets, which consisted principally of $575,000 in cash. Oceans, which was already in the process of liquidation, would then be liquidated and the Fairfield stock would be distributed to the Oceans stockholders on liquidation. These negotiations continued into February of 1971, when an agreement was finalized. [2]
On March 17, 1971 counsel for Oceans filed a ruling request with the Internal Revenue Service seeking a determination that the proposed plan of reorganization would qualify as a tax free reorganization within the meaning of section 368(a)(1)(C) of the Code. The Internal Revenue Service issued a private letter ruling on May 14, 1971 holding that the proposed transaction *581 qualified as a reorganization under section 368(a)(1)(C). The plan of reorganization was consumated June 9, 1971, with Greers Ferry receiving from Oceans approximately $575,000 in cash and net operating loss carryovers in the amount of $1,645,767. The shareholders of Oceans became shareholders of Fairfield, receiving slightly over 5 percent of the outstanding stock of Fairfield. Subsequent to the acquisition of Oceans, Fairfield became a publicly owned corporation under the Securities and Exchange Act of 1934 with the common stock being traded on the over the counter market. During the course of the negotiations with Oceans, Fairfield's management realized that even if the Oceans' cash became available, Fairfield would either have to curtail its selling activities in 1971 or acquire additional financing. Fairfield began negotiations with the First National Bank of Boston for a substantial loan to replace Heller and other creditors. On February 25, 1971 the First National Bank of Boston agreed that Fairfield could borrow up to $10,000,000 from it and other participating banks on a revolving credit basis, subject to certain conditions and at an interest rate of 2 percent above prime, *582 plus an annual service charge of 2-1/2 percent. The loan was secured by a deed of trust or mortgage on all the unsold Tennessee and Arkansas real estate, and by assignment of all receivables from installment sales contracts at the date of the loan agreement at both the Tennessee and Arkansas locations. One of the limitations was that the amount of the loan could not exceed $4,000,000 prior to October 31, 1971, and $6,000,000 prior to February 28, 1973. Oceans, a Delaware corporation, was incorporated in May, 1968 to provide engineering support operations and services for business enterprises and governmental agencies engaged in oceanography and other marine related activities, and to design and develop surface and underwater recreational facilities and equipment. In 1968 Oceans acquired all the capital stock of Bay Tech Associates, Inc., an engineering consulting firm since 1967. In 1969 Oceans established a boat building subsidiary, Ocean Marine Products, Inc., and another subsidiary, Oceanside Marina, Inc. to purchase and develop property as a marina. Prior to the summer of 1970, Ocean Marine Products, Inc. manufactured and sold 18, 21 and 28 foot sports fishing boats; and *583 Oceanside Marina, Inc. purchased a 12 acre tract of undeveloped land in Marathon, Florida, which was planned to be developed into a marina. Oceans and its subsidiaries were not financially successful and by the end of 1970 they had ceased operations and liquidated their assets to avoid further erosion of the investments of the Oceans stockholders. At that time Oceans had about $641,000 in cash and few known liabilities. It also had a net operating loss carryover of $1,645,767. Oceans had claimed on its tax returns for 1968, 1969, 1970 and 1971 net operating losses in the respective amounts of $196,962, $346,503, $931,834 and $134,787. In the summer of 1970, Oceans engaged the services of Marentette and Company, an investment banking firm, to sell Oceans, merge it, or otherwise dispose of the company in a fashion that would be advantageous to the current stockholders of Oceans. Joseph Bianco, then the Vice-President of Marentette in charge of the corporate finance department, proceeded to evaluate the company and its assets, prepare a prospectus on the company and seek out prospective buyers for the company. He thereafter placed an ad in the Wall Street Journal indicating the financial *584 and other facts about Oceans and soliciting offers to merge or buy the company. This ad led to the contact with John Rex, representing Fairfield, and the negotiations that followed, which have been related above and which resulted in the sale of Oceans to Greers Ferry. Computer Property Corporation, also known and herein referred to as CPC, a Delaware corporation organized in 1967, was engaged in the business of leasing, selling and programing computer equipment. CPC was a profitable company. Paul Paganucci, a member of the investment banking firm of Lombard, Vitalis, Paganucci & Nelson, Inc., was a stockholder, officer and director of both CPC and Fairfield. He was active in the financial affairs of both CPC and Fairfield. Other investors were also stockholders in both CPC and Fairfield. In August of 1971 negotiations began between CPC and Fairfield with regard to a possible merger of the two companies. On November 15, 1971 Fairfield, Greers Ferry, and CPC entered into a plan of reorganization under which CPC would be merged into Greers Ferry with each share of stock of CPC being converted into 1.8 shares of Fairfield common stock. Greers Ferry was the surviving corporation and *585 it assumed all the assets and liabilities of CPC. CPC ceased to exist but the name of Greers Ferry was changed to Computer Property Corporation. Fairfield continued to own all the outstanding stock of CPC (formerly Greers Ferry). The merger became effective on December 31, 1971. Subsequent to the merger the operating losses that Greers Ferry had acquired from Oceans were used to offset the income of CPC. In July of 1973 the tax manager of Fairfield met with Leon Teske, an accountant with Peat, Marwick & Mitchell, who had taken over as tax manager in charge of the Fairfield account for Peat, Marwick & Mitchell, to discuss the possibilities for utilizing Fairfield's available operating loss carryovers for tax purposes. Teske undertook extensive tax planning to accomplish this objective. He found no evidence that any such tax planning had been undertaken on behalf of Fairfield before. He realized that in crder for Fairfield to take advantage of its own available operating loss carryovers before they expired, Fairfield would have to generate taxable income. This would involve a change in its method of accounting for its installment sales for tax puposes.He determined that under *586 the revenue laws and regulations Fairfield could account for some of its sales on the accrual basis and the others on the installment basis. This was done and Fairfield began reporting a profit before operating losses for tax purposes. For the taxable years before us, February 28, 1974, 1975 and 1976, Fairfield and its subsidiaries claimed net operating loss deductions on their consolidated returns in the amounts of $1,176,069, $446,139 and $8,860, respectively. [3] Respondent disallowed the deductions claimed as net operating loss carryovers. ULTIMATE FINDING The principal *587 purpose of Fairfield in acquiring the assets and liabilities of Oceans was not to evade or avoid Federal income taxes by acquiring Oceans' net operating loss carryovers. OPINION The only issue for decision is whether the principal purpose motivating the acquisition of all the property of Oceans, a loss corporation, by Greers Ferry, a wholly owned subsidiary of Fairfield, was the evasion or avoidance of Federal income tax within the meaning of section 269 of the Code. [4]
Section 269(a)(2) provides that if any corporation acquires, directly or indirectly, property of another corporation not controlled immediately before the acquisition by the acquiring corporation or its stockholders, the basis of which property in the hands of the acquiring corporation is determined by reference to the basis in the hands of the transferor corporation, and the principal purpose for such acquisition is to evade or avoid Federal income tax by securing the benefit *588 of a deduction, credit, or other allowance, which such corporation would not otherwise enjoy, then the Secretary may disallow such deduction, credit or other allowance. The deductions disallowed in this case are the net operating losses of Oceans, incurred prior to the acquisition, which were utilized by Fairfield and its subsidiaries in their consolidated returns for the years involved. Sections 381(a)(2) and 381(c) permit a corporation acquiring the assets of another corporation, under certain specified circumstances, to succeed to the net operating loss carryovers of the transferor corporation. The requirements of section 381(a)(2) are satisfied here (section 361 is applicable and the transaction qualified as a tax free reorganization described in section 368(a)(1)(C)) so the only question is what was the principal purpose for the acquisition. For section 269(a) to be applicable, a tax evasion or avoidance motive must have been the principal purpose for the acquisition of Oceans' assets and it must have outranked or exceeded in importance any other purpose. Hawaiian Trust Co. v. United States,291 F.2d 761 (9th Cir. 1961); Daytona Beach Kennel Club, Inc. v. Commissioner,69 T.C. 1015 (1978).To *589 prevail, petitioner need prove only that the avoidance of tax was not the principal purpose; nevertheless, petitioner has the burden of proving that the respondent's determination on this issue was incorrect. Capri, Inc. v. Commissioner,65 T.C. 162 (1975); Rocco, Inc. v. Commissioner,72 T.C. 140 (1979). We find that petitioner has carried that burden. It is well settled that the principal purpose at the time the transaction took place is the determining factor and that events which take place after the transaction, unless shown to be a step in the same transaction, are not determinative of the principal purpose within the meaning of section 269. Hawaiian Trust Co. v. United States,supra;Capri, Inc. v. Commissioner,supra.However, evidence of subsequent events which tend to support or negate the purported purpose may be offered for that purpose. In determining the purpose for which an acquisition was made, we must scrutinize the entire circumstances in which the transaction occurred, and make a subjective evaluation of petitioner's motives. Scroll, Inc. v. Commissioner,447 F.2d 612 (5th Cir. 1971), affg. a Memorandum Opinion of this Court. [5]
Petitioner *590 contends that its primary purpose in acquiring the assets of Oceans was to obtain Oceans' cash, which it needed to continue its expanding business, and, secondarily, to make the relatively large number of stockholders of Oceans stockholders of Fairfield, thereby qualifying Fairfield to offer its stock on the over the counter market to raise badly needed additional equity capital. Petitioner admits that its officers were aware of the fact that Oceans had a large operating loss carryover but that this was not bargained for because they thought it was doubtful, given certain tax laws and Fairfield's own large operating losses, that Fairfield would be able to use more than 25 to 30 percent of Oceans' losses at the most, if it was able to use any at all. In support of its contention, petitioner introduced into evidence financial records of Fairfield illustrating its continuing need for cash to carry on and expand its business due to its method of developing and selling its real estate, and its efforts to raise cash in the past through bank loans, private sales of its stock, and finally through its aborted effort to "go public" with its stock. There can be little question based on the *591 record in this case that Fairfield had a continuing need for cash to conduct its business and that it was initially, at least, attracted to Oceans by its large amount of cash. Petitioner also offered the testimony of its officers, directors, and accountants who participated in both the decision to open negotiations with Oceans and in the actual negotiations themselves.Their uncontradicted testimony indicates that while some thought may have been given by them to the operating loss carryovers of Oceans, this was minimal and the principal reasons for acquiring Oceans were to obtain its cash and increase the number of Fairfield's stockholders. The ad placed in the Wall Street Journal by Oceans, which prompted Fairfield's investigation, mentioned Oceans' cash status but did not mention the operating losses. These witnesses, the testimony of all of whom we found to be forthright and credible, also testified that the withdrawal in the Spring of 1970 of the proposed public offering of its stock left Fairfield in an "almost terminal condition" cashwise both with respect to completing its summer selling program for 1970 and preparing for its summer selling program for 1971. They pointed *592 out that the cash raised through the private placement of stock in the Fall of 1970 only enabled Fairfield to pay its bills incurred during the 1970 selling program. They also testified that no consideration was given to the operating loss carryover by either side in the negotiations for the price Fairfield would pay for Oceans' assets. That price was based on the value of Oceans' book assets less its liabilities, and it was to be adjusted downward if the cash and net assets of Oceans were ultimately determined to be less than anticipated.Minutes of directors meetings held during the course of the negotiations, correspondence between the negotiators, and memoranda prepared contemporaneously by the negotiators for their own use support the testimony of the witnesses. Petitioner also offered the testimony of Mullen, the then chairman of Oceans who represented that company in the negotiations, and the testimony of Bianco, who in 1970 was vice president of Marantette and Company, an investment banking firm that had been employed by Oceans to try to sell the assets of the company. They both testified that Fairfield appeared to be primarily interested in Oceans' cash and the fact that *593 Oceans was a public company, that in their discussions with the representatives of Fairfield there was no indication that Fairfield was interested in the operating losses of Oceans, that neither Oceans nor Fairfield attempted to negotiate any consideration for the losses, and that the subject simply did not come up for discussion. Respondent did not call any witnesses to testify but relies on cross examination of petitioner's witnesses and objective facts, some of which relate to events that occurred after the acquisition, to support its determination that the principal purpose for Fairfield's acquisition of Oceans' assets was tax avoidance. Respondent contends that the top management of Fairfield was aware of the net operating losses of Oceans, that the value of those loss carryovers to Fairfield and its subsidiaries would far exceed the value of the Oceans' book assets, and that the original plan of reorganization (Fairfield to buy Oceans' assets directly) was restructured to avoid the restrictions of section 382(b) and permit Greers Ferry to take full advantage of Oceans' losses. This, respondent contends, is strong evidence that Fairfield's principal purpose for acquiring the *594 assets of Oceans was tax avoidance. While this scenario might support respondent's position, it is just not developed by the evidence. The uncontradicted testimony of Fairfield's top management was that while they were aware of the losses they considered them to be of little value to Fairfield because Fairfield had its own loss carryovers, and they also believed that even if Fairfield could claim the losses, the amount thereof would be severely limited by other provisions in the law. Fairfield sought no tax advice to determine whether this was true because it was not very much interested in the losses. Knowledge of and even consideration of the tax aspects in connection with an acquisition does not mandatorily require application of section 269. D'Arcy-MacManus & Masius, Inc. v. Commissioner,63 T.C. 440 (1975); VGS Corp. v. Commissioner,68 T.C. 563 (1977). It was not until two years later that Fairfield was advised that it could change its method of accounting for certain sales to produce net income which would permit it to absorb its own prior years' losses. Later tax planning after the acquisition to better use the net operating loss carryovers is not relevant to petitioner's *595 purpose at the time of the acquisition. Glen Raven Mills, Inc. v. Commissioner,59 T.C. 1 (1972). Also the evidence is clear that the structure of the acquisition was changed because counsel for Oceans insisted that the acquiring corporation assume any unknown and conditional liabilities of Oceans and its subsidiaries. Therefore, Fairfield decided to have Greers Ferry, which had practically no assets, become the acquiring corporation using Fairfield's stock to pay the purchase price. Petitioner also points out that its management was aware of the possibility that if Greers Ferry acquired the assets and deductions of Oceans, the Oceans' operating loss carryovers might be limited to offsetting the net income of Greers Ferry only. Since Greers Ferry had no net income and very little prospects at that time of having any in the future, the restructuring of the form of the transaction might preclude Fairfield from ever realizing any tax benefit from the Oceans' losses. Therefore, the restructuring of the planned acquisition might have been detrimental rather than beneficial taxwise to Fairfield. [6] *596 Respondent argues that petitioners sought a tax ruling that the transaction as finally agreed upon qualified as a tax free reorganization to make sure that the losses of Oceans would be available to Fairfield and its subsidiaries after the acquisition. But, the evidence reflects that counsel for Oceans wanted and obtained a ruling that the transaction would be tax free under section 368(a)(1)(C) so that Oceans stockholders would not have to recognize their losses upon liquidation of Oceans. Respondent also contends that the subsequent merger of CPC into Greers Ferry was an integrated step in the overall plan to permit Fairfield to take advantage of Oceans' loss carryovers by making Greers Ferry a profitable corporation through the use of CPC's income. Here again the record does not support respondent's contention and there is not a scrap of evidence that has been called to our attention that a merger with CPC was even considered by anyone prior to August of 1971, two months after the acquisition of Oceans' *597 assets was completed. The merger of CPC into Greers Ferry was not accomplished until December 31, 1971. It is true that several of the directors of CPC were also directors of Fairfield but this does not prove that there was a preconceived plan on the part of Fairfield at the time of the acquisition of Oceans to have CPC merged into Greers Ferry. Their testimony was to the contrary. As previously noted, steps taken after the transaction in question that were not a part of the transaction are irrelevant to petitioner's purpose in entering into the transaction. Respondent further contends that Fairfield was not in need of cash at the time of the acquisition so that acquiring Oceans' cash could not have been the primary purpose for the acquisition. Respondent points to the fact that Fairfield had cash on hand as of February 28, 1971 in the amount of $641,610, and that Fairfield had received a line of credit of up to $10,000,000 from the First National Bank of Boston and other participating banks in February of 1971. Petitioner has demonstrated that the cash on hand was insufficient to carry Fairfield through its 1971 summer selling programs without curtailing its operations. The *598 Bank of Boston line of credit was limited to $4,000,000 in the first year and had other conditions that restricted its use. That line of credit was also used to pay off the Heller loan and several bank loans. It is also evident that the agreement between Fairfield, Greers Ferry and Oceans had been finalized, except for obtaining a tax ruling, at the time the Bank of Boston line of credit was obtained. Furthermore, the Oceans' cash would provide Fairfield with additional equity capital upon which it would not have to pay interest. We cannot find that Fairfield's cash position as of February 28, 1971 changed its purpose for acquiring Oceans' assets. Respondent argues that the value of the Fairfield stock exchanged for Oceans' assets was substantially disproportionate to the aggregate of the assets and transferable deductions acquired which, under section 269(c), is prima facie evidence of a tax avoidance motive for the acquisition, and that this should add further weight to the presumption of correctness of respondent's determination. Section 269(c) was repealed on October 4, 1976 [7] for years after 1976. The legislative history of this repeal indicates that section 269(c) was *599 redundant, given the general principle of tax litigation that the Commissioner's determination is presumptively correct and the tax-payer has the burden of proving otherwise. See H.R. Rept. No. 94-658, 94 Cong. 1st Sess. 377 (1975), 1976-3 C.B. (Vol.2) 1069. In fact, section 269(c) generally has been viewed more as a "procedural device" than a conclusive presumption. See Industrial Suppliers, Inc. v. Commissioner,50 T.C. 635, 646 (1968); H.F. Ramsey Co. v. Commissioner,43 T.C. 500, 517 (1965). [8] Furthermore, there is no proof that the value of the Fairfield stock exchanged was substantially disproportionate to the value of the assets acquired. We are not convinced by the above and other arguments of respondent that Fairfield's primary purpose in acquiring the assets of Oceans was tax avoidance. Respondent has relied on assumptions and inferences unsupported by the record to determine that the primary purpose for the acquisition was to obtain the use of Oceans' net operating loss carryover. The record indicates that such was not the *600 primary purpose for the acquisition and respondent's determination was in error. Decision will be entered for the Petitioner.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as effective for the years here involved.↩
2. Fairfield did not seek tax advice, other than that of its own officers, prior to or during these negotiations.↩
3. The net operating loss carryover utilized to offset the income of Fairfield itself appears to have been the net operating loss carryovers of Fairfield and the net operating loss carryovers of Oceans appear to have been offset against the income of CPC. This was not stipulated and cannot be determined from the notice of deficiency. The reproduced tax returns stipulated into evidence are too indistinct to be sure of this fact. Neither party argues that the available net operating losses, if usable, were improperly utilized on the returns. See section 1.1502-21(c), Income Tax Regs.↩, relative to consolidated returns.
4. The limitations on net operating loss carryovers contained in section 382 do not apply to this transaction, as structured, by virtue of section 382(b)(6). Respondent agrees with this on brief and raised no issue with reference to section 382.↩
5. See also Power-Line Sales, Inc. v. Commissioner,T.C. Memo. 1977-43↩.
6. We need not and do not decide whether Fairfield's management correctly interpreted the law in this respect. But, see section 1.1502-21(c), Income Tax Regs.↩ It is simply illustrative of one consideration that may have entered into the purpose for the acquisition.
7. Section 1901(a)(38) of the Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1771. ↩
8. See Princeton Aviation Corp. v. Commissioner,T.C. Memo 1983-735↩.